### PARKER v. NEW ENGLAND OIL CORPORATION.
#### Petition of WILTSEE.

(District Court, D. Massachusetts. April 28, 1926.)

#### No. 1747.

1. **Corporations ⬅574—If committee intrusted with carrying out reorganization plan were guilty of fraud damaging receivership estate, they are responsible thereto whether decree authorizing reorganization is vacated or not.**

If committee intrusted by decree in receivership proceeding with carrying out reorganization plan were guilty of fraud damaging receivership estate, they are responsible thereto for all damage occasioned, without regard to whether decree authorizing reorganization is vacated.

2. **Corporations ⬅574—Decree in receivership proceeding authorizing committee to carry out plan of reorganization obtained by fraud and disregarded by committee is no defense to proceedings for breach of trust.**

A decree in receivership proceedings authorizing committee to carry out plan of reorganization obtained by fraud and also disregarded by committee as fiduciaries is no defense to proceedings against committee for breach of trust.

3. **Corporations ⬅574—Committee, authorized to carry out reorganization plan by decree in receivership proceeding, having participated in hearings brought on by creditor's petition, held not entitled to contend that creditors' rights could not be enforced in such proceedings.**

Where, after decree in receivership proceeding authorizing committee to carry out plan of reorganization, creditor filed petition praying investigation of proceedings of committee, and committee participated in proceedings with no suggestion that they desired additional pleadings and with knowledge that court regarded pleadings as sufficient and understood creditors were seeking to recover for maladministration, held, that committee could not thereafter contend that liability to creditors could not be enforced in such proceedings.

4. **Corporations ⬅574—Creditors, complaining of maladministration of committee authorized by decree in receivership proceedings to carry out reorganization plan, cannot be deprived of their rights by failure of court to instruct receiver to institute proceedings.**

Creditors, complaining of maladministration of committee authorized by decree in receivership proceeding to carry out plan of reorganization, cannot be deprived of their rights by failure or refusal of the court to instruct its receiver to institute proceedings for uncomplaining creditors.

5. **Pleading ⬅237(3)—Amendments to pleadings for purpose of bringing them into conformity with evidence will be allowed any time before judgment.**

When contested issues have been fully heard, but on pleadings which turn out to be inadequate, it is practice of courts to allow amendments at any time before judgment, bringing the pleadings into conformity with the evidence.

6. **Corporations ⬅574—Creditors held entitled to determination of rights in proceeding instituted by creditor for investigation of actions of committee authorized by decree in receivership proceeding to carry out plan of reorganization.**

Creditors held entitled to a determination of their rights in proceeding instituted by creditor for investigation of proceedings of committee, authorized by decree in receivership proceeding to carry out plan of reorganization, wherein committee had participated.

7. **Corporations ⬅574—Deposit agreement of creditors with committee for promotion of contemplated reorganization plan held not to bar remedy against committee for maladministration.**

Deposit agreement, under which committee as fiduciaries took legal but not beneficial title to claims of depositing creditors to represent them in promotion of contemplated reorganization of receivership estate, held not to bar such creditors from remedy against committee for maladministration; it not being necessary that deposit agreement be set aside by independent bill in equity.

**8. Evidence ⚏43(1)—Receiver's knowledge, obtained after his appointment, concerning receivership estate, cannot be imputed to court in charge of receivership without actual disclosure.**

Receiver's knowledge, obtained after his appointment as such, relative to interlocking relations of committee authorized by decree in receivership proceeding to carry out plan of reorganization, cannot be imputed to court in charge of receivership without actual disclosure.

**9. Corporations ⚏574—Committee authorized by decree in receivership proceeding to carry out reorganization plan held not exonerated from responsibility to court and to cestuis qui trust by receiver's knowledge of facts which might have led him to make inquiry into committee's conduct.**

Even if receiver had, as in this case he had not, knowledge of wrongdoing of committee authorized by decree in receivership proceeding to carry out plan of reorganization, such knowledge would not have exonerated such committee from their own direct responsibility to the court and to their cestuis que trust.

**10. Corporations ⚏574—After interlocutory decree in proceedings by creditor for investigation of committee authorized in receivership proceeding to carry out reorganization plan, committee held not entitled to offer evidence as on trial de novo.**

Where, after hearing on creditor's petition for investigation of committee authorized by decree in receivership proceeding to carry out reorganization plan, interlocutory decree was entered, committee not having filed petition for rehearing *held* not entitled to introduce evidence on subsequent hearing on general issue of their liability on theory that they were entitled to a trial de novo.

**11. Corporations ⚏574—Contract for purchase of tankers, concealed from court by committee authorized by decree in receivership proceeding to carry out reorganization plan of oil company, held fraudulent and unenforceable.**

Contract by oil company for purchase of tankers which entailed payment of $17,271,000 for tankers actually bought by seller from United States government for $2,940,000, and which was concealed from court by committee authorized by decree in receivership proceeding to carry out plan of reorganization, *held* fraudulent and unenforceable.

**12. Corporations ⚏574—Evidence held to show that contract concealed by committee, authorized by decree in receivership proceeding to carry out reorganization plan, was tainted by fraud on government and could not have been enforced (Merchant Marine Act 1920, §§ 1, 5, 7 [Comp. St. Ann. Supp. 1923, §§ 8146¼, 8146¼aaa, 8146¼cc]).**

Evidence *held* to show that contract, concealed from court by committee authorized in receivership proceeding to carry out reorganization plan of oil company, for purchase of tankers from syndicate who were to obtain tankers from the United States government, was tainted by fraud on government, in view of Merchant Marine Act 1920, §§ 1, 5, 7 (Comp. St. Ann. Supp. 1923, §§ 8146¼, 8146¼aaa,

8146¼cc), and could not have been enforced by syndicate.

**13. Corporations ⚏574—Evidence held to show that oil corporation, at time committee was intrusted in receivership proceeding with reorganization, was solvent, entitling creditors to full recovery for committee's maladministration.**

Evidence *held* to show that oil corporation, at time committee by decree in receivership proceeding were intrusted with plan of reorganization, was solvent under proper administration entitling creditors to full recovery for maladministration of such committee.

**14. Corporations ⚏574—Member of committee intrusted by decree with reorganization plan, though reluctantly assenting to committee's wrongdoing, is liable with others therefor.**

Member of committee intrusted by decree in receivership proceeding with carrying out reorganization plan, who, though reluctant to join in committee's wrongdoing, finanally assented thereto, was liable together with balance of committee.

**15. Corporations ⚏574—Committee intrusted with carrying out reorganization plan in receivership proceeding held liable for maladministration, although not appropriating to themselves any large part of maladministered trust estate.**

Committee intrusted by decree in receivership proceeding with carrying out reorganization plan are liable for maladministration, although not appropriating to themselves any large part of such maladministered trust estate, since the law looks to safety of trust estate and not to profit or loss of unfaithful fiduciaries.

**16. Corporations ⚏579(2).**

Creditors of a restored solvent receivership estate are entitled to have their claims paid in full.

**17. Corporations ⚏574—Committee intrusted in receivership proceeding with carrying out reorganization plan held liable for maladministration to amount necessary to give all complaining creditors equivalence of rights under proper administration, including expenses of litigation.**

Committee intrusted by decree in receivership proceeding with carrying out reorganization plan, having fraudulently diverted estate funds, *held* liable to receivership estate for damage done by them to amount necessary to give all creditors complaining of such maladministration equivalence of rights they would have received under proper administration, including necessary expenses of litigation.

**18. Attorney and client ⚏141—Aggregate counsel fees for four different law firms for services in exposing maladministration of committee, intrusted in receivership proceeding with reorganization plan, reduced from claim of $212,500 to $140,000.**

Aggregate counsel fees in sum of $212,500, claimed by creditors for litigation against committee intrusted by decree in receivership proceeding with reorganization plan, for serv-

ices of four different law firms in litigation exposing committee's maladministration involving 50 to 60 days of sharply contested court proceedings, *held* too high, and reduced to gross fee of $140,000.

**19. Corporations** ⬤⟹574—**Tender of stock accepted by creditors in accordance with reorganization plan of committee authorized by decree in receivership proceedings is not condition precedent to recognition of rights against committee for their maladministration of trust estate.**

Where creditors, in accordance with reorganization plan of committee authorized by decree in receivership proceeding, accepted stocks in lieu of claims against corporation, tender of such stocks for benefit of committee is not a condition precedent to recognition of rights against committee for their maladministration.

**20. Trusts** ⬤⟹219(2).

Wrongdoing trustees are liable to pay interest compounded with semiannual rests.

In equity. Receivership proceeding by Henry S. Parker against the New England Oil Corporation. On petition by Ernest Wiltsee to avoid a reorganization made through a committee. On various motions and pleadings. Decree in accordance with opinion.

Sherman L. Whipple, Frederick Foster, and Claude B. Cross, all of Boston, Mass., for intervening petitioner Wiltsee and others.

Arthur D. Hill, of Boston, Mass., for intervening petitioner Island Oil Marketing Corporation.

Romney Spring, of Boston, Mass., for intervening petitioners Ballard and others.

Lincoln Bryant, of Boston, Mass., for intervening petitioner Russell.

Charles F. Choate, Jr., and Nathan Matthews, both of Boston, Mass., for noteholders' committee.

Frederick R. Ryan, of New York City, for Finthswait, member of noteholders' committee.

ANDERSON, Circuit Judge. This opinion supplements and, to be understood, must be read with, the opinion of October 3, 1925, 8 F.(2d) 392. Pursuant to that opinion, an amended interlocutory decree was entered on December 14, 1925, which (summarized) adjudicated:

(1) That the reorganization of the receivership estate effected by the committee was invalid.

(2) That the decree of February, 17, 1923, approving a plan of reorganization, was obtained by fraud, and should be vacated or modified if and in so far as such decree might affect the rights of Wiltsee and/or of any other creditors seeking and held entitled to join in these proceedings.

(3) That creditors are entitled to elect to rescind the settlements of their debt claims made by them with the committee, and to be reinstated in rights as unpaid creditors against the receivership estate and/or such committee.

(4) That the receiver send each creditor a copy of the opinion, with a notice that such right to rescind should be exercised on or before January 8, 1926, by depositing the creditor's stock with the receiver, to be held subject to the future order of the court.

(5) That the receiver file an intervening petition for creditors so authorizing and instructing him, whose stocks shall have been received by him.

(6) That any party in interest might, on or before January 18, 1926, file objections to the right of any creditor thus seeking to rescind.

(7) That the case stand for a hearing on January 25, 1926, on all petitions to intervene and objections thereto, and on any other appropriate pleadings, as well as on the general issue of the extent of the committee's liability.

Pursuant to this notice, about 335 creditors, whose claims, without interest, aggregate about $2,300,000, have filed intervening petitions (most of them accompanied by a deposit of stocks with the receiver), 260 claims, about $800,000 in amount, by the receiver, and the balance by counsel; the committee have appeared by new counsel, and have filed a large variety of motions and pleadings. Some of their pleadings seek to raise issues going to the foundation of their liability; others raise minor questions as to the status of intervening creditors.

The committee's main contentions have been argued at great length by two counsel for the committee and by four or more counsel for the creditors. While many new aspects of the bulky record, and particularly of some of the exhibits, have by both sides been now urged upon the court, no substantial error in the findings set forth in the former opinion has been found. Certain findings are hereafter amplified, and to that extent modified. All other findings have stood the test of reargument and are affirmed—except that the interest rate on the loan of $1,300,000 was 8 per cent., not 7 per cent., as stated (8 F. [2d] 404), and the alleged revised cost of the tankers was $8,451,000 and not $8,541,000.

Every conceivable technical objection has been urged in the committee's favor—both against the use of the present record as a

basis for any adjudication of rights, and also that, on this record, no liability of the committee accrues. But counsel for the committee, though in effect invited to do so, have expressly declined to file a petition for rehearing in order to supply any of the argued inadequacies of the existing record.

The main contention of counsel for the committee is that, assuming maladministration by the committee, no liability to creditors can, in these proceedings, be enforced; that such liability can only be enforced in new proceedings, instituted by the receiver, and not by Wiltsee or by any other creditor or class of creditors. They urge that a trial which lasted nearly 40 days, with a resultant record of about 3,500 pages, besides about 175 exhibits, was nothing but "an investigation," from which no rights can be worked out either for Wiltsee or for any other creditors. This contention makes it necessary to state in some detail the history of the proceedings.

On May 8, 1924, Wiltsee, after this court had held his claim valid for $176,000, filed a petition asking for information concerning the reorganization effected by this committee under the decree of February 17, 1923. This petition resulted in the opinion of July 18, 1924 (4 F.[2d] 392), and a decree that the committee were fiduciaries having the general rights and powers and being subject to the general obligations and limitations of trustees, and that they should make a report covering the reorganization. Counsel for the committee accepted this ruling as correct; such report was filed on August 27, 1924. On March 13, 1925, Wiltsee filed another petition, alleging that this report was inadequate, and asking that the committee be ordered to file another and complete report; and on April 4, 1925, he filed a long amendment, setting out that the committee did not act in the interest of the creditors or stockholders of the New England Oil Corporation (of whose assets the receiver was appointed), but had directed the reorganization to the purpose of acquiring control of the New England Oil Refining Company for the Petroleum Heat & Power Company or of the Mexican Petroleum Company, etc. The prayer was for an investigation of the entire proceedings of the committee and of others who had participated with the committee in the reorganization, in order that it might be determined whether the court's approval of the plan should not be revoked, or some other appropriate remedy given the petitioner and other creditors and stockholders of the New England Oil Refining Company. He sought

an examination of witnesses in open court. In the light of the present contention that the subsequent proceedings involved no attack by Wiltsee upon the validity of the reorganization or assertion of liability by the committee, it is important to note that before any evidence whatever (except the committee's first report) had been offered, Wiltsee's petition had expressly suggested that the decree approving the plan should be revoked.

While probably not of importance, it may as well here be noted that the order vacating or modifying the decree of February 17, 1923, if and in so far as such decree may affect the rights of Wiltsee or of any other intervening creditors, was not by this court "initiated of its own motion," as the Court of Appeals in the mandamus case was in some fashion erroneously led to assume. 9 F.(2d) 347. Wiltsee's petition of May 8, 1924, expressly suggested such rescission or modification; and the same view was urged upon the court at the very end of the brief received by the court from Wiltsee's counsel on August 27, 1925. The court initiated nothing, except the notice to uninformed creditors; it dealt with the contentions of litigants.

[1, 2] This court, of course, accepts the view of the Court of Appeals—that if the committee "have been guilty of fraud that has damaged the receivership estate, they are responsible thereto for all the damage they have occasioned it, without regard to whether the decree of February 17 is or is not vacated." 9 F.(2d) 347. At any rate, not only was the decree obtained by fraud, but the reorganization effected by the committee was ultra vires the decree they obtained. A decree grounded in fraud and also disregarded by fiduciaries is no defense to proceedings for breach of trust.

On April 8, 1925, Wiltsee filed, pursuant to order of the court, elaborate specifications of the matters concerning which he desired to offer evidence, covering some 15 described details, besides alleging in general terms that the reorganization had not been successful either in giving value to the stock of the reorganized concern or in preserving the assets of the receivership estate.

The actual trial began on April 8, 1925, at 2 o'clock. Wiltsee's counsel then called the plaintiff Parker and the lawyer who had drafted the bill, both of whom testified briefly. The hearing was then adjourned to April 10, 1925. At the very opening of this second day's hearing, counsel for the committee complained that the proceedings in their publicity and otherwise were unjust to the com-

mittee and to Palmer, their counsel; he referred to the court's opinion of July 18, 1924, saying:

"Under the opinion filed by your honor in the inquiry before you, where the reorganizers, that is the noteholders' committee, 'bring a faithful purpose. to administer the estate for the beneficial owners and in no part for their own benefit, or for any outside concern in which they have presently or prospectively any interest, their discretion is not, ordinarily, subject to review or criticism by the court. In a word, if they have reorganized the receivership estate for the benefit of its owners, and not for the benefit of themselves, directly or indirectly, their honest use of their wide discretionary powers is not to be revised by the court.'

"Therefore that is the issue before us, whether the reorganization was for the benefit of the owners of this property or whether somebody there was actuated by considerations of his own interest, outside of and beyond and adverse to the interests of the receivership estate."

After lengthy discussion and against objection by Wiltsee's counsel, the court granted the motion of the committee that they be permitted to go forward and show affirmatively legal and faithful performance of their fiduciary duties, assuming (as their counsel elected to assume) "the general burden which rests upon parties plaintiff."

Under this ruling, the trial proceeded until counsel for the committee rested their case on July 31, 1925, on the theory that they had then offered all the evidence that they desired to offer both as to the value of the estate they took and their administration of it. Wiltsee's counsel called no witnesses; he argued liability to his client on the evidence adduced by the committee themselves, supplemented and corrected, of course, by cross-examination.

But meantime, as the case developed, the court had become disturbed at the indications that the decree of February 17, 1923, even if valid, had not been complied with; and on April 15, 1925, read into the record a memorandum opinion covering nine points (Rec. pp. 452–456), leading to the conclusion that the committee should file an additional and full and complete report of their doings. This opinion pointed out that the documents annexed to the petition of the committee were inconsistent with the printed plan approved by the court, and suggested that it was inconceivable that if these inconsistent documents had been brought to Judge Morton's

attention he would not have promptly and emphatically disapproved of them and perhaps of the whole reorganization plan. Pursuant to this opinion, a decree was entered on April 27, 1925, providing for an additional report by the committee; such report was filed on May 19, 1925. It is an important part of the evidence. It goes far toward establishing the committee's liability.

During these hearings, consuming between April 8 and July 31, 1925, over 30 days, at no time did the committee suggest that they had either the right or the desire to require any additional pleadings from Wiltsee; or that on their part they desired to file any pleadings additional to the two reports that they had already filed.

There were objections by the committee to evidence on cross-examination tending to show illegal combination to control the oil market. On June 26, 1925, the court adopted, in effect, the contentions of counsel for the committee; and in a memorandum opinion ruled that the "anti-trust case," should not be tried as a part of these proceedings.

In this opinion, the court said, "Counsel for Wiltsee was able to give the court no satisfactory answer to the question as to what decree should be entered, if all his contentions in that regard were sustained," and pointed out the grave questions which had arisen under the disclosures already made, and the duty resting upon the committee of making a full showing of legal and faithful performance of their fiduciary obligation, as the proceedings were "for the obvious purpose of ascertaining and protecting rights entitled to protection in this court," and concluded as follows:

"Early in the hearing on motion of counsel for the noteholders' committee, the court ruled that the noteholders' committee were entitled to go forward, showing affirmatively legal and faithful performance of their fiduciary duties. They have not yet completed their case. The case must stand * * * for full hearing of all evidence thought by the reorganizers to justify their proceedings and of course for any evidence offered by Wiltsee or any other party in interest leading to the contrary conclusion not inconsistent with this memorandum."

This ruling (sought and obtained by the committee), went flatly on the ground that the court would try no issue in these proceedings which would not ground an effective decree "protecting rights entitled to protection in this court," and was accepted by Wiltsee's

counsel as a proper guide in the rest of the trial.

[3] After thus eliminating the "anti-trust issue," the trial proceeded on the theory that Wiltsee was seeking to recover from the committee for maladministration (not including illegal control of the oil market) the amount of his claim. It must have been clear to all parties that the court so understood the situation. If the committee did not so understand it, and did not intend the court so to understand it, it was their plain duty then to call the matter to the court's attention. This they did not do; but they proceeded with the trial of the case on pleadings which, as they knew, the court regarded as sufficient to support the issues being tried. They now contend that the pleadings were insufficient for that purpose. Either the committee then understood the matter as the court and Wiltsee's counsel did, and went ahead on the understanding that the issue of their liability was being tried; or they did not so understand it, and kept silent. In either aspect, they cannot now be heard to say that during the subsequent 18 days of hearing the court was presiding over an empty and fruitless ceremony called "an investigation."

"An investigation" is a proceeding unknown to a court of justice, either in law or in equity. Courts sit and hear evidence in order to adjudicate the rights of parties actually or potentially before them. They do not preside over mere investigations, grounded either on curiosity or as merely preliminary to a (possible) future suit. Not even a bill of discovery could be regarded as an investigation, as the committee would now have the term applied to the proceedings in this cause.

There was also during the hearings repeated discussion as to the court's owing an affirmative duty to other creditors (then uninformed of the true situation) who, if Wiltsee's contention of maladministration should be sustained, had analogous rights. In June, 1925, a suggestion was made that the case might be disposed of by a settlement of Wiltsee's claim; and the negotiations therefor were disclosed to the court because of the court's indicated views as to the rights of other creditors. The court was then in such doubt as to the nature and extent of its affirmative duty to other creditors, that Judge Morton was asked to sit, and did sit, with the writer in order to participate in determining whether the court could then properly permit the proceedings to be ended by a settlement of Wiltsee's claim, when, as it then

seemed, the receivership estate had not been disposed of in accordance with the court's decree or with proper regard to the rights of the chief beneficial owners. The statements in the former opinion (8 F.[2d] 401), relative to what occurred in February, 1923, before Judge Morton, and the nature and extent of his knowledge of the situation, are based upon Judge Morton's statements made at this hearing in the presence of counsel, and thus made a part of the record in this case. It is therefore unnecessary to consider to what extent one judge sitting as District Court may properly ground findings upon statements, dehors the record, made by another judge, as to the latter's knowledge or lack of knowledge of important facts when participating in the conduct of the same case.

This proposed settlement fell through. But there was no chance of misunderstanding by counsel for the committee that the case then being tried was the liability of the committee to Wiltsee and to other creditors who might after due notice subsequently acquire a like legal status.

On July 28, 1925, as the trial drew toward its end, Wiltsee filed a lengthy petition, sketching in ten paragraphs the history of the receivership and the reorganization, and charging that the committee had maladministered and lost a large part thereof, and should therefore be required to pay either to the corporation for his benefit or, to avoid circuity, directly to him the amount of his claim for $176,000, together with the expenses of the litigation. Doubtless as a result of the court's indicated views that Wiltsee's claim was no better than that of other creditors, and that the court owed an affirmative duty to notify creditors of the apparent maladministration of the estate, Wiltsee on July 31, 1925, moved that he be allowed to file, nunc pro tunc, as of May 8, 1924 (the date of his original petition seeking information), a petition in behalf of himself and of other creditors who might thereafter join, charging maladministration, with many named particulars and with resultant prayers that the committee be held liable for the amount of assets misused, wasted, or dissipated by them, together with the reasonable expenses of the litigation. While counsel for the committee objected to the allowance of this petition, nunc pro tunc, there was no other seasonable objection to its being filed. It was allowed, nunc pro tunc. If necessary at all, it was at most but a formal assertion of Wiltsee's contentions as to the legal results of the evidence adduced from the committee and their witnesses as to their

administration of a receivership estate, of which Wiltsee and the other creditors were the chief beneficial owners. In effect, this petition was but a reassertion of contentions which had been under discussion throughout the trial.

Parenthetically, the petition of July 28, 1925, stands as Wiltsee's alternative assertion of his rights in case the petition of July 31, for creditors as a class, should for any reason fail.

On July 31, 1925, the evidence was closed, except that the right was reserved to Wiltsee to show his expenses for attorney's fees, stenographer's bills, etc., incurred, as he contended, in behalf of the creditors as a class and due to the maladministration by the committee. With this single exception, the trial was, so far as evidence was concerned, then a completed trial; neither Wiltsee nor the committee had, except under equity rule 69—which deals with petitions for rehearing—a right to offer further evidence either on the solvency of the estate or on the liability of the committee.

On August 7, 1925, at the close of the oral arguments, the court stated orally at length conclusions of fact substantially the same as those afterwards embodied in the opinion of October 3, 1925. The legal results of the facts then stated counsel were asked to consider and brief. The court then said that, while withholding final judgment, there was no doubt that the trust estate had been damaged by maladministration to an amount in excess of Wiltsee's claim and the reasonable expenses incurred in the litigation; that if Wiltsee's own claim was the only thing involved, there would be no hesitation in finding that the committee, or some of them, ought to pay Wiltsee's claim and the expenses of the proceedings made necessary by the maladministration of the estate.

Counsel for the committee were thus apprised some 20 days before the case was finally submitted on written briefs of the court's main findings of fact, and that on the facts this court held the committee liable to Wiltsee and probably to other creditors for large sums. Yet in the light of these findings, the case was briefed without suggestion (except that of Mr. Dodge as noted below) that it had not been fully heard and argued; or that, either as matter of pleading or as matter of evidence, the committee's rights had not been fully secured.

It is true that under date of August 31, 1925 (weeks after the case had been argued by other counsel and after the submission of elaborate briefs on both sides), Robert G. Dodge, Esq., who had appeared for the committee during most of the trial, but had left for Europe before its completion, filed a reply argument in which he suggested, rather faintly and casually, that in these proceedings no decree for money damages could properly be entered—the first time any such point was raised. But the most of this final argument was devoted to the merits of the committee's performances, and not to the form of remedy if they were held in the wrong. And not even then (a month before the filing of the opinion) was there any fault found with Wiltsee's pleadings, nor suggestion that the committee desired to file new or additional pleadings or adduce further evidence in defense of their use of their admitted fiduciary obligation owed all creditors and parties in interest in the estate. If Mr. Dodge had then regarded this suggestion seriously, he would, of course, have then moved to dismiss the Wiltsee petitions; or he would have filed answers; and, if he thought additional evidence could have bettered his clients' case, he would have sought and obtained opportunity to present it. He did none of these things. He left this court to spend weeks in studying the record and in preparing an opinion on a case then submitted for the determination of the rights of parties litigant.

The case was argued and briefed in August. The court's opinion was filed on October 3, 1925. A decree followed on October 8. Not even then was there a suggestion by counsel for the committee that the committee desired to change in any particular—either as to pleadings or as to evidence—the record that had been made during the forty days trial. On the contrary, the contention then made by the committee was that the decree was a final decree, which they desired forthwith to have, on the existing record, reviewed and reversed by the Court of Appeals. Mandamus proceedings to enforce that contention were instituted (9 F.[2d] 344), and delayed the proceedings in this court nearly three months, with substantial additional expense to Wiltsee. They now urge that they were contending before the Court of Appeals for a right to argue, as against an alleged final decree of this court, a record which was not even a partial trial—only "an investigation." Never until January 23, 1926, were any motions or other pleadings filed by the committee suggesting that they had not had a full hearing on pleadings and evidence (both) satisfactory to them. On that day an answer,

and various other pleadings which need not now be described in detail, were filed.

The committee's contention that only the receiver can enforce a liability against them comes, on analysis, to two propositions:

(1) That creditors now in court should not be allowed to conduct their own litigation, by their own counsel, in accordance with their own theory of their rights; that the court should oust the parties in real interest and their counsel, and put its receiver in general charge of their litigation.

[4] (2) That the court should order its receiver to proceed for creditors who, after due notice, have indicated no desire to seek relief in these proceedings. This amounts to contending that the court has unduly limited the number and amount of claims against the committee—a complaint that can hardly be taken seriously. Creditors complaining of the committee's maladministration cannot be deprived of their rights by the court's failure or refusal to instruct its receiver to institute proceedings for uncomplaining creditors.

Stockholders of the holding company (the only other persons having any conceivable interest in the receivership estate) do not, and apparently could not, assert a right in these proceedings to upset the settlement made with them. These stockholders, preferred and common, received through the reorganization common stock of the refining company (4 F.[2d] 397, 398) which took over all of the assets of their corporation. The holding company was then abandoned and probably went legally out of existence. Besides, these stockholders were, so far as appears in this record, Cochrane, Harper & Co. and their nominees, parties to the scheme of defrauding creditors, who had contributed about $3,000,000 to the oil enterprise, and were without standing in any court to attack the plan formulated, with their participation, to conceal and effect this fraud. Compare 9 F.(2d) 347. It conclusively follows that all parties in interest, having any claim to relief in these proceedings, are now before the court asserting their right, through their own counsel, to obtain relief for a breach of trust.

[5] Wherever, technically, the burden of proof lies, the result, on the indisputable facts in this case, is the same; for, as pointed out in the former opinion (8 F.[2d] 393), the controlling facts here)do not depend upon findings grounded on conflicting parol evidence, but appear in records, and are practically undisputed. Moreover, when contested issues have been fully heard, but upon pleadings which turn out to be inadequate,

it is the uniform practice of courts to allow amendments at any time before judgment, bringing the pleadings into conformity with the evidence. Neale v. Neale, 9 Wall. 1, 19 L. Ed. 590; Washington, etc., Ry. v. Scala, 244 U. S. 630, 640, 37 S. Ct. 654, 61 L. Ed. 1360; Snyder v. Rosenbaum, 215 U. S. 261, 264, 30 S. Ct. 73, 54 L. Ed. 186. It is therefore unnecessary to consider whether this case falls technically under the rule laid down in such cases as Wood v. Farwell, 195 Mass. 559, 81 N. E. 294.

Nor is it necessary to consider whether intervening creditors might now have a right to offer additional evidence on liability; for all such creditors join in the Wiltsee petition and rest their rights on all questions of liability on the record already made, limiting themselves merely to establishing their status under the decree of December 14, 1925.

[6] Counsel for all the creditors join in asking this court to rule that there has been a full trial of all questions of liability and that they are, on this record, entitled to a determination of their rights by this court and by the court above. This request is granted.

[7] The committee also urge that the deposit agreement of November 15, 1922, bars all creditors (except Wiltsee) of a remedy against the committee, unless and until it be set aside on an independent bill in equity brought by the creditors themselves against the committee. This proposition is untenable. This deposit agreement was, in effect, a power of attorney coupled with an interest, under which the committee as fiduciaries took legal, but not beneficial, title to the notes and claims of depositing creditors, for the purpose of representing them in court, in order to promote, through the court, a contemplated reorganization of the receivership estate in the interest of the beneficial owners thereof. The agreement did not contemplate a reorganization in pais; it did contemplate that the committee should, by invoking action by the court, cause the depositing creditors to receive, in some form, in lieu of their debt claims, the full and fair equivalent of their beneficial interests in the receivership res. While the deposit agreement contains elaborate provisions limiting the committee's liabilities, it does not and could not legally limit their liability for their own fraud. As this court has already found fraud both in the methods used in obtaining these deposits and in the use made of them in the court proceedings (8 F.[2d] 411, 419, 420), and has also found that the plan of reorganization authorized by the court was never effected by

the committee, it is clear that the case is radically different from that of Habirshaw Elec. Cable Co. v. Cable Co. (C. C. A.) 296 F. 875, relied upon by the committee.

Moreover, after having obtained such deposits wrongfully, and used them wrongfully to promote interests adverse to those of their cestuis, the committee, in May, 1923, declared the agreements terminated. It may be conceded that such termination could not have invalidated acts done under the deposit agreements if they had been legally obtained and properly used. But it is too clear for argument that the committee cannot now resurrect them and plead them in bar of the creditors' rights to have, through the instrumentality of the court that held their property in trust, the equivalent of the rights they had when the committtee obtained control of the receivership estate.

The case bears close analogy to that of Haines v. Buckeye Wheel Co., 224 F. 289, 139 C. C. A. 525, on appeal, 233 F. 665, 147 C. C. A. 473, certiorari denied, 242 U. S. 643, 37 S. Ct. 213, 61 L. Ed. 542. See, also, In re Veler, 249 F. 633, 161 C. C. A. 543. Harrigan v. Gilchrist, 121 Wis. 127, 99 N. W. 909, is a learned and instructive opinion.

[8] The committee argue that the receiver, Mr. Garfield, had some knowledge of the relations of Smith, Chace, and the Tanker Syndicate to the plan of reorganization; that the receiver's knowledge, if obtained after his appointment as such, is imputed to the court; and that, therefore, the court was not, as matter of law, deceived as to the relations of the reorganizers to the Tanker Syndicate. The proposition that a receiver's knowledge is, without actual disclosure, to be imputed to the court in charge of a receivership, seems to this court too untenable to call for discussion.

The stress laid upon the receiver's alleged knowledge and upon his argued disclosures to the court makes it appropriate to reaffirm the statement made in the former opinion (8 F. [2d] 402) that, "Neither in pleadings, nor in any other court papers, *nor orally,* was the substance of the real plan of reorganization, and the relations of the parties formulating the scheme, brought to the attention of the court responsible for the administration of this estate."

Neither directly nor indirectly was any disclosure made by the committee, or by the receiver, to the court, in any way inconsistent with the express representations made by the committee, when seeking to become parties to the proceedings, that they were a committee representing noteholders, and thus by necessary implication representing no adverse interests. 8 F.(2d) 399.

Rarely does a court have a receivership in which, as the case is presented to it, its affirmative duties appear to be more narrowly limited. When, in the fall of 1922, the writer first heard of the existence of this receivership (constituted by Judge Mack in July, 1922), he learned that the receivership covered merely a holding company and not an operating company. The court was early informed that bankers, presumably having for their banks an interest in the enterprise, would shortly present themselves as a committee to undertake a reorganization of the concern. The duties of the court appeared to be (1) to see that the committee, when it presented itself, was made, on the record, responsible for the use of the powers it sought; (2) that adequate notice was given to every party in interest, so that any differing views as to the plan suggested by the committee might be submitted to the court; (3) to decide such questions if presented. But none were presented.

After the approval of the plan, under which the committee, purporting to represent most of the beneficial interests in the company, sought and obtained almost complete control of the receivership res, little remained for the court except to enter, pro forma, decrees for effecting the committee's plan. This was the exterior appearance of the case.

It is suggested that the court learned at some time that there was a Tanker Syndicate claim of some $18,000,000, and that for some inscrutable reason that fact should have made the court suspicious of the qualifications and conduct of the committee—conduct to which nobody was objecting—and thus have led to a critical investigation of the whole situation. It is true that at some time, probably in March or April, 1923, the court was informed by its receiver that a claimant called the "Tanker Syndicate" (the name meant nothing to the court) had filed a claim for some $18,000,000, the allowance of which the receivers did not recommend. That put this claim in the same category as the Wiltsee claim—one that the court must be prepared to try on evidence.

The natural inference was that the committee would defend the estate against this claim as they did against the Wiltsee claim. (C. C. A.) 3 F.(2d) 424, 425. To have permitted ex parte statements from the receiver as to the nature and merits of a claim likely to be tried would have been obviously improper, and the receiver made no such statements.

The court believed the committee to be what they said they were—faithful and fully qualified representatives of the chief beneficial owners of the court's trust estate. The receiver never disclosed anything to the court inconsistent with that view.

[9] But even if Mr. Garfield had been, as he was not, cognizant of the committee's wrongdoing, it would not have exonerated them from their own direct responsibility to the court and to their cestuis que trust. The attempt of the committee now to hide behind Mr. Garfield's alleged knowledge has neither moral nor legal standing. In fact, he had, seasonably, very little knowledge of the real situation.

Finally, in order to prevent these creditors from having, in this proceeding or on this record, any decision as to their rights against the committee, counsel for the committee have resorted to tactics which this court feels compelled to say seem quite unjustifiable. This aspect of the matter should be dealt with— if action is necessary—by some other judge or tribunal. Cooke v. United States, 267 U. S. 517, 539, 45 S. Ct. 390, 69 L. Ed. 767; Cornish v. United States, 299 F. 283; Coll v. United States, 8 F.(2d) 20, 24.

[10] Although declining, as noted above, to file any petition for a rehearing in order to supplement the existing record, the committee have offered evidence on the theory that they are entitled to a trial de novo on the general issue of their liability. As stated above, the creditors contend that they are entitled to a determination of their rights on this record, except and unless supplemented by a rehearing on a petition filed under the rule; they therefore object to evidence offered, on the theory of a trial de novo. In this position, the creditors are, in the opinion of this court, correct. Accordingly, all evidence offered under this theory has been excluded. Of course, all evidence bearing upon the status of intervening creditors, coming in under the decree of December 14, 1925, has been admitted.

None of the other contentions of the committee seem to call for discussion.

The main questions, then, arise on the findings set forth in the former opinion. But counsel for the creditors now urge that in two aspects the findings and conclusions in that opinion should be amplified:

(1) As to the genesis and voidability for fraud of the Tanker contract;

(2) As to the solvency of the receivership estate.

When the case was submitted in August, 1925, the bearing of the Tanker contract upon the main issue in this case was not fully argued. A corrupt motive was the inescapable suspicion. What that motive was, was not discerned; for there was then no adequate analysis of several votes in the records of the corporations which are now seen to show the actuating motive.

Under these circumstances, in preparing that opinion for a merely interlocutory decree (a leading feature of which was to notify creditors of their rights and give them an opportunity to elect whether to assert them), it seemed unnecessary to go farther than to say, as to this contract: "Whether voidable for fraud or not, it was a transaction that should have been fully disclosed to the court and to its intended victims, the chief beneficial owners of the receivership estate. The committee had no right to conceal it and to use their powers, as trustees of the assigning beneficial owners and as appointees of the court, to affirm and effectuate it. While not, as a committee, responsible for making it, their later conduct fell little short of full adoption." And, "What induced, or compelled, the directors of these oil corporations to enter upon this contract, does not clearly appear. No director voting for it, except Palmer and Cochrane, has been called to explain the transaction. It remains unexplained, and upon the present record does not appear susceptible of an)honest explanation." 8 F.(2d) 407, 406.

While, of the directors voting for this contract, Palmer and Cochrane were called as witnesses, the implication that these directors were "called to explain the transaction" is, when their testimony is carefully reviewed, not accurate. In fact, there is practically no parol evidence in the entire record bearing upon the motives leading the directors of these oil corporations to vote to make these companies liable for $17,271,000 for tankers which no one at that time, as Farley's letter shows, even argued to be worth half that sum. 8 F.(2d) 405.

But counsel for Wiltsee have now analyzed records which show plainly the motives that led Cochrane and other directors to vote thus to turn over the property of the oil companies to the Tanker Syndicate.

To appreciate the significance of the evidence on this point, it is necessary to go back to 1920, when the holding company authorized an issue of $8,000,000 of the 8 per cent. convertible gold notes. At that time, the promoters, Cochrane, Harper & Co., apparently owned all of the stock of the holding com-

pany. They also undertook to market $6,-000,000 of this $8,000,000 of notes, at 89 net to the holding company; the notes seem to have been turned over in installments and paid for as the marketing went on. In March, 1921, Cochrane, Harper & Co. desired to obtain possession, and apparent ownership, of a block of $616,000 of these notes, without then paying or obligating themselves (directly) to pay therefor at the agreed price of 89.

The transaction appears first in the record of a meeting of the executive committee of the oil corporation, on March 18, 1921, present: Llewellyn Howland, J. W. Perkins, and John P. Bowditch. Three days later Bowditch resigned, and Allan Forbes was made a member of the committee. At another meeting on March 21, 1921 (Perkins, Howland, Forbes, Cochrane, and Harper present), it was voted: That the transaction of March 18 be ratified, adopted, and approved and confirmed.

The transaction is shown by two letters each dated March 18, the first from Cochrane, Harper & Co. as follows:

"New England Oil Corporation, 19 Milk St., Boston, Mass.—Dear Sirs: In conformity with our verbal agreement with you, we hereby deliver to you, securities, a list of which is hereto annexed, in full payment for $616,000 principal amount of the five-year eight per cent. convertible gold notes of your corporation at 89 and accrued interest.

"In case you should sell the securities, either as a lot or in parcels from time to time, we will, on or before January 1, 1922, pay you the difference, if any, between the aggregate price which you receive for all of said securities and the sum of $548,240, plus an amount equivalent to the accrued interest on said amount of notes, or we will, at your request, repurchase, on or before January 1, 1922, all of the said securities at not less than the said sum, plus said interest.

"Yours very truly,
"Cochrane, Harper & Co."

| | | | |
|---|---|---|---|
| 40 | shs. | Architects Sample Corp. | Pfd. |
| 230 | " | Commercial Trust Co. | |
| 400 | " | Forbes-Perkins Co. | |
| 672 | " | Kleskun Ranch, Ltd. | |
| 22,109 | " | Lamson & Hubbard Corp. | Com. |
| 2,655 | " | Lamson & Hubbard Can. Co. Ltd. | " |
| 12,994 | " | Tex-Kan Oil Corp. | |
| 350 | " | Washington Oil Co. | |
| $3,000 | | Phyllis Navigation Co. | Bonds |
| 38,000 | | Marine Operating Co. | " |
| 5,000 | | Nova Scotia Trans. Co. | " |
| 57,000 | | French American Ser. A. | " |
| 47,000 | | French American Ser. B. | " |
| 18,000 | | Norland Line First Mtge. | " |
| 20,000 | | Norland Line Second Mtge. | " |

The reply is as follows:

"Messrs. Cochrane, Harper & Co., 60 State St., Boston, Mass.—Gentlemen: We acknowledge receipt of your letter of even date, together with the list of securities attached. In accordance with our understanding, we accept these securities in payment of $616,000, principal amount of five-year eight per cent. convertible gold notes of our corporation.

"We understand that part of the consideration for this transaction is your obligation to reimburse us for any difference between the total price which we may obtain for all of the said securities and the sum of $548,240, plus interest accrued on said notes or at our request to repurchase the said securities at the price as stated in your letter.

"Very truly yours,
"New England Oil Corporation,
"By Samuel Vaughan, Treasurer."

This was an agreement between the holding company and Cochrane, Harper & Co. to sell Cochrane, Harper & Co. a block of 8 per cent. notes ($616,000) taking "in payment" this lot of "securities," with what was in effect an agreement that Cochrane, Harper & Co. should take these "securities" back and pay for them on or before January 1, 1922. Counsel for the committee concede that these "securities" were worthless. It follows that the "payment" was no payment; and that Cochrane, Harper & Co. were bound to pay to the holding company on or before January 1, 1922, $548,240 with interest, apparently at 8 per cent. from June 1, 1920—nearly $600,-000.

This firm was also, as the records show, in November, 1921, under obligation to take and pay for at 89 net the balance of $560,000 of the $6,000,000 of the 8 per cent. notes. Hence, in November, 1921, this firm owed nearly $600,000 for 8 per cent. notes they had already received and marketed or used for their own purposes, and were under an additional obligation to take and to pay for another block of $560,000 of the same notes, at 89, an aggregate of over $1,000,000.

Moreover, six months interest (4 per cent., about $220,000) fell due on December 1, 1922, on $5,440,000 of the 8 per cent. notes of the holding company then outstanding, and the corporation was without the funds to meet this interest. Clearly, if the interest on the note issue was defaulted on December 1, while Cochrane, Harper & Co. were the debtors to the holding company for nearly $600,000, which debt—*in form* but not in fact—they had "paid" by the delivery of worthless se-

curities, a very embarrassing situation to these promoters would have resulted. Their relations to the Boston banks at this time are not clearly disclosed; but the fair inference is that the banks held Cochrane, Harper & Co.'s paper for substantial amounts, with oil corporation 8 per cent. notes as collateral; their financial status at that time is not clearly shown, but they settled with their creditors in 1923.

It was under these (unpleasant for him) conditions that Cochrane entered into negotiations with Smith and Chace for the purchase of these seven tankers. Just how much Smith, Chace and the Old Colony Trust Company had then sunk in the worthless second mortgage bonds on these tankers does not appear. As a result of the negotiations, the Tanker Syndicate agreed to loan to the Refining Company $1,300,000 repayable in monthly installments extending over 10 years with interest at 8 per cent. But about $500,000 was agreed to be shortly repaid (as it was), out of the proceeds of a public issue of $520,000, 7 per cent. notes floated on the credit of the Refining Company and guaranteed by Smith's concern. This issue cut under the outstanding notes of the holding company. This left $800,000 as the real intended loan by the tanker interests. Votes relative to this $800,000, not understood in August, 1925, have, in the light of these circumstances, acquired great significance.

On November 28, 1921, at a meeting of the directors of the Refining Company (8 F. [2d] 405), after voting the tanker contract, the record proceeds (Exhibit 3):

"It was pointed out to the meeting that in order to enable this company to perform said contract with Tanker Syndicate, Inc., it was necessary to obtain the guaranty of the New England Oil Corporation to the said contract together with one hundred thousand (100,000) shares of its common stock, and certain other securities.

"Thereupon, upon motion duly made and seconded, it was unanimously

"Resolved: That the treasurer or assistant treasurer of this company be and he is hereby authorized and directed to offer in the name and on behalf of this company to purchase from the New England Oil Corporation one hundred thousand (100,000) shares in the capital stock of said New England Oil Corporation for the sum of two hundred and twenty-two thousand dollars ($222,000); to purchase from said corporation for the sum of five hundred seventy-seven thousand eight hundred and thirty-eight dollars and thirty-four cents ($577,838.34) with interest at the rate of eight per cent. (8%) per annum on five hundred and ninety-four thousand nine hundred and thirty-two dollars and fifty-nine cents ($594,932.59) from December 1st, 1921, until the actual date of the delivery of said securities the following named securities: [Here follows a list obviously intended to be the list stated in the letter of March 18, 1921, for it is so referred to in the accepting vote of the holding company below. The discrepancies are for present purposes immaterial,] and to pay to said New England Oil Corporation an amount equal to the difference between eight hundred thousand dollars ($800,000) and the sum of the amounts paid for said stock and securities in consideration of its guaranty of the contract with the Tanker Syndicate, Inc., this day authorized. And in the event that the New England Oil Corporation shall accept the said offer the treasurer or assistant treasurer of this company be and he hereby is authorized to pay to the said corporation the aggregate principal sum of eight hundred thousand dollars ($800,000) upon the performance by the said corporation of the various things to be by it performed in accordance with the terms of the said offer.

"(Mr. Cochrane, Mr. Harper, and Mr. Farley not voting.)

"Upon motion duly made and seconded it was unanimously

"Resolved: That in accordance with the suggestion of Malcolm G. Chace in his letter to this company and to the said corporation dated November 25, 1921, the treasurer be and hereby is authorized to deliver said securities referred to in the above vote, other than said one hundred thousand (100,000) shares of common stock of New England Oil Corporation, to Cochrane, Harper & Co.

"(Mr. Cochrane, Mr. Harper, and Mr. Farley not voting.)

"Upon motion duly made and seconded, it was unanimously

"Resolved: That in the event that the New England Oil Corporation accepts the offer above authorized and transfers to this company or its order the said one hundred thousand (100,000) shares of the common stock of said New England Oil Corporation, the treasurer or assistant treasurer be and hereby is authorized to deliver said one hundred thousand (100,000) shares of the common stock of the said New England Oil Corporation to Old Colony Trust Company of Boston in escrow on such terms and arrangements as the treasurer may determine.

"(Mr. Cochrane, Mr. Harper, and Mr. Farley not voting.)"

This sum of $222,000 thus put into the

treasury of the oil corporation was obviously for the purpose of meeting the December interest on the $5,440,000 of notes then outstanding. But with the balance of the $800,000 the Refining Company voted to buy from the Oil Corporation (the holding company) the worthless securities delivered on March 18, 1921, by Cochrane, Harper & Co. "in payment" for a block of $616,000 par of the 8 per cent. notes.

At a meeting of the directors of the Oil Corporation held on the same day, November 28, 1921, present F. Douglas Cochrane, George W. Treat, Llewellyn Howland, Allan Forbes, John F. Perkins, John W. Farley, Bradley W. Palmer, R. M. H. Harper, Gaspar G. Bacon; after passing other votes authorizing the tanker contract, the record proceeds as follows:

"Upon motion duly made and seconded it was

"Resolved: That this corporation accept the offer of the New England Oil Refining Company to purchase from this corporation one hundred thousand (100,000) shares of its common stock for the sum of two hundred and twenty-two thousand dollars ($222,000), and to purchase from this corporation the securities now held by it in accordance with the terms of its agreement with Cochrane, Harper & Co., dated March 18, 1921, for the sum of five hundred and seventy-seven thousand eight hundred and thirty-eight dollars and thirty-four cents ($577,838.34) with interest at the rate of eight per cent. (8%) per annum on five hundred and ninety-four thousand nine hundred and thirty-two dollars and fifty-nine cents ($594,932.59) from December 1, 1921, until the actual date of the delivery of said securities and to pay this corporation an amount equal to the difference between eight hundred thousand dollars ($800,000) and the sum of the amounts paid for said stock and securities in consideration of its guaranty of the said contract between the New England Oil Refining Company and the said Tanker Syndicate, Inc., being an aggregate payment of eight hundred thousand dollars ($800,000) in respect of the various acts to be performed by this corporation in accordance with the terms of the said offer.

"Upon motion duly made and seconded it was

"Resolved: That in accordance with the terms of the agreement of March 18, 1921, the securities therein referred to having been sold for the amount guaranteed, Cochrane, Harper & Co. have, prior to the date of this meeting, ceased to be and now are no longer under any liability of any name or nature in connection with said agreement; and that the treasurer or assistant treasurer be and hereby is authorized and directed to notify Cochrane, Harper & Co. to that effect, and to execute and deliver a release discharging them from any and all obligations under said agreement, said release to be in such form as the said Cochrane, Harper & Co. may request.

"Mr. Cochrane and Mr. Harper not voting."

This was thus in form a sale of the worthless securities to the refining company for the amount due from Cochrane, Harper & Co. for the block of $616,000 of the 8 per cent. notes.

As a result of this transaction, the worthless securities became the property of the Refining Company, and the directors of the Refining Company voted (as stated above) that, pursuant to a suggestion contained in a letter of Malcolm G. Chace (called for but not produced), these securities should be delivered to Cochrane, Harper & Co. There is nowhere any suggestion that this firm should, or did, in any form, pay to either corporation anything for these securities, or for the original liability incurred by them when this block of $616,000 of 8 per cent. notes was delivered to them. It follows that "about $4,836,000 derived from the purchasers of the holding company's 8 per cent gold notes" (8 F. [2d] 403) should be reduced by nearly $600,000. In result the transaction was a gift of this block of $616,000 notes to Cochrane, Harper & Co.

There is another vote to release this firm from any obligation to take and pay for the $560,000 remaining of the $6,000,000 of the 8 per cent. notes. This put Cochrane, Harper & Co. out of the financing; the Tanker Syndicate took it over.

Smith, Chace, Palmer, and Forbes were all participants in this transaction. This court can see no escape from the conclusion urged by counsel for the creditors that the essence of this transaction was an arrangement that Cochrane, Harper & Co., who with their associates and employees on the board of directors dominated the oil enterprise, were by the Tanker Syndicate thus relieved from personal liability for nearly $600,000, in consideration of their causing their corporation to vote to buy these tankers for $17,271,000.

Put bluntly, this amounts to bribing the controlling directors of the purchasing corporations to commit a gross breach of trust by turning over the bulk of the property of their corporations to the Tanker Syndicate. The chief victims were of course the stockholders of the refining company; and mainly on that

stock rested the notes for $5,440,000 of the holding company.

That these directors did not pass these votes blindly or inadvertently, assuming that Cochrane, Harper & Co. were, as the stockholders of the holding company, in effect dealing only with their own property, is made entirely clear by the language in Farley's letter of November 19, 1921, parts of which are quoted in the margin in the former opinion (8 F.[2d] 405); for Farley then said, referring to the liability under the Tanker Contract (Exhibit 132): "This will be an obligation of the Refining Company, ahead, of course, of the stock, and ahead of the New England Oil Corporation notes which are based on the stock of the Refining Company, and in case of default *will unquestionably cut out the oil corporation notes from any interest in the property.*" But, after writing this warning, which, in effect, stigmatized the whole transaction as a fraud upon the noteholders, Farley and all the other directors (except Treat) voted for the tanker contract. Farley's whole letter must be read and construed in the light of the circumstances to appreciate fully the sinister significance of the transaction.

Further support for the construction put by counsel for the creditors upon these records is found in evidence—briefly and inadequately considered near the close of the hearing last summer. At that time, when the treasurer (called by the committee) was explaining certain accounts, inquiry was made as to the meaning of a phrase in one of the reports showing the status of the enterprise on December 31, 1922:

"Payments on Tanker Fleet and cost of acquiring contract, $1,167,778."

As it elsewhere appeared that the "payments made on Tanker Fleet" in 1922 were $650,474, $517,304 was left as the apparent "cost of acquiring the contract." The court requested the witness to ascertain and explain the next day this unusual item and term. This was not done. On the contrary, the witness, the night before his promised explanation, notified counsel for the committee that he was going to New York. The significance of his failure to appear and explain the item and the term was not then appreciated. But taken now in connection with the records above sketched and other evidence which need not be detailed, the inference is irresistible that the loss to the oil enterprise accruing from releasing Cochrane, Harper & Co. from their obligation to pay at 89 for the block of $616,000 of the 8 per cent. notes was, in large part, charged off under the term "cost of acquiring tanker contract." It is true that the figures cannot be reconciled exactly. But there were so many necessary adjustments of interest and other items, that exact accord could not be expected. The same item may probably be concealed under the term, "Loss on sale of securities $2,400,635.65," found near the end of the liability column in the receiver's consolidated balance sheet. 8 F.(2d) 397.

The "cost of acquiring the contract" item cannot be explained as the bonus to Chace for buying the government's mortgage for $2,940,000; for his alleged bonus of $346,000 (and more) is covered in the alleged adjusted price as of January 1, 1922, $8,451,000; for the second mortgage bonds were (if all procured by the Tanker Syndicate) only $4,421,000, and the price paid to the government $2,940,000, an aggregate of $7,361,000, which leaves $1,090,000 to cover bonus and all possible adjustments of interest and expenses.

A vote to pay out of other people's money (and that is what the directors of this oil enterprise were undertaking to do) $17,271,000 for tankers not claimed to be worth half that sum, and then intended to be bought, and a little later actually bought, from the United States government for $2,940,000, falls in and of itself little short of being conclusively fraudulent upon bona fide investors in the oil enterprise. And when such an unconscionable price is to be paid entirely out of other people's money, and the agreement to pay it is in reality effected even if not technically voted by directors who, as a part of the same transaction, are relieved of personal liability for nearly $600,000 the inference of fraud is irresistible. In financial result to the oil enterprise the transaction was substantially as though it had bought the worthless second mortgage bonds at their face, $4,271,000, and also agreed to pay Chace about $1,500,000 for buying the tankers from the government for $2,940,000. The purchase of the tankers was, in essence, but a gloss for the purchase of the second mortgage bonds. No such transaction was ever authorized by a sane set of directors, acting for the benefit of their corporations and not for the benefit of some or all of the directors. There is much other evidence forcing the mind to the same result.

[11] The necessary conclusion is that the tanker contract was not merely questionable, a transaction that any competent and faithful set of fiduciaries would have fully disclosed to the court and to their cestuis, its

intended victims; it was plainly fraudulent and unenforceable. The responsibility of the committee for concealing it must be weighed in the light of this finding and ruling.

On this branch of the case counsel for the creditors request findings and rulings as follows:

(1) The tanker contract of November 29, 1921, was procured by fraud, and was therefore a voidable contract.

(2) The Tanker Syndicate, Inc., knew that of the $1,300,000, to be advanced by it under the said tanker contract, about $600,-000 was to be used to bribe Cochrane and his associates to vote for the execution of the tanker contract, and it could not have recovered either from the Refining Company or the Oil Corporation the $1,300,000 so advanced.

(3) At the time of the so-called reorganization, the noteholders' committee's counsel, Bradley W. Palmer, and at least two of its members, Messrs. Hart and Forbes, knew, or should have known, at the outset that the original tanker contract was obtained by fraud, and was therefore voidable. One of the court's receivers, Gaspar G. Bacon, also knew of this, as did Malcolm G. Chace, one of the syndicate managers, which simply made up a subcommittee of the noteholders' committee. The other members of the committee shortly thereafter knew, or should have known, that the said contract was voidable, because it had been procured by fraud.

(4) Noteholders' committee, by permitting further payments to the Tanker Syndicate, Inc., from the proceeds of the sale of the general mortgage bonds, allowed the Tanker Syndicate, Inc., to receive up to March 1, 1923, about $4,000,000, the Tanker Syndicate, Inc., receiving the repayment in full of the $1,300,000 which it could not have recovered,—about $1,755,491.06 on or about March 1, 1923, and had received $658,851.80 during the year 1922. There was the further payment by the refining company of over $500,000 in the year 1922, as cost for acquiring the contract.

These requests must in their substance be granted; the figures may not be exactly correct, but that is unimportant.

Compare Thomas v. R. R., 109 U. S. 522, 3 S. Ct. 315, 27 L. Ed. 1018; Wardell v. R. R., 103 U. S. 651, 658, 26 L. Ed. 509; Brinckerhoff v. Roosevelt (C. C.) 131 F. 955; Von Arnim v. Am. Tube Works, 74 N. E. 680, 188 Mass. 515; Marcy v. Development Co. (D. C.) 228 F. 150; Meyer v. Fort Hill Eng. Co., 249 Mass. 302, 143 N. E. 915.

Counsel for the creditors also contend that the tanker contract was voidable as a fraud upon the federal government. This contention makes it necessary to consider carefully just what the real undertaking was, on the construction and claims of the committee themselves.

The committee urge that although, on its face, the refining company contracted to pay $17,271,000 for seven tankers having at that time a conceded market value of less than half that sum, the real undertaking, whether evidenced as a mere "understanding" or by "a gentlemen's agreement," was that after the execution of the contract an attempt should be made to induce the government to sell the tankers (or its first mortgage of over $13,-500,000, which was really the title to the tankers) for but a fraction of that sum; and that the oil enterprise should, by reduction in price, get part of the benefit accruing from such expected reduction in the government's first 5 per cent. mortgage. (Schedule B of the contract.) It was obvious and had been discussed (Farley's letter, par. 7, 8 F.[2d] 405) that there would be no chance of getting the Shipping Board to reduce the first mortgage unless the existence of a contract that the oil companies should pay both the first and the second mortgage, was effectually concealed from the Shipping Board. Concealment of the real situation was therefore the crucial part of the "agreement" or "understanding,"—as the committee themselves now claim it to have been. Moreover, it was also contemplated that Chace, who, as a result of the contract, became a director and member of the executive committees of the oil companies, should act as the chosen representative of the oil companies to negotiate with the Shipping Board; but should present himself as a representative of the Swiftsure concern, or of holders of second mortgage bonds, and thus moved to buy the first mortgage in the hope of recoupment of losses made in the junior securities.

The situation, as it must have been made to appear to the Shipping Board, requires examination of their statutory powers.

The powers of the Shipping Board now pertinent are found in the Merchant Marine Act of June 5, 1920, 41 Stat. 988 (Compiled Statutes, Supp. 1923, p. 2344 et seq.). Section 1 of the act (Comp. St. Ann. Supp. 1923, § 8146¼) states it to be the purpose and policy of the United States to develop and encourage the maintenance of a merchant marine ultimately to be owned and operated privately by citizens of the United States. Section 5 (section 8146¼aaa) provides:

"That in order to accomplish the declared purposes of this act, and to carry out the policy declared in section 1 hereof, the board is authorized and directed to sell, as soon as practicable, consistent with good business methods and the objects and purposes to be attained by this act, at public or private competitive sale after appraisement and due advertisement, to persons who are citizens of the United States except as provided in section 6 of this act, all of the vessels referred to in section 4 of this act or otherwise acquired by the board. Such sale shall be made at such prices and on such terms and conditions as the board may prescribe, but the completion of the payment of the purchase price and interest shall not be deferred more than fifteen years after the making of the contract of sale. The board in fixing or accepting the sale price of such vessels shall take into consideration the prevailing domestic and foreign market price of, the available supply of, and the demand for vessels, existing freight rates and prospects of their maintenance, the cost of constructing vessels of similar types under prevailing conditions, as well as the cost of the construction or purchase price of the vessels to be sold, and any other facts or conditions that would influence a prudent, solvent business man in the sale of similar vessels or property which he is not forced to sell."

The power of the Shipping Board to sell has, in section 5, three checks: (1) "At public or private *competitive* sale," (2) "after appraisement," (3) "after due advertisement." Appraisement, advertisement, and competition (invoked even if in vain) are all requisite to a valid sale.

The advertising was, of course, provided in order to procure competition; the appraisement was to prevent a sale, even if apparently competitive, at any price too far below the market value as shown by the foreign and domestic market, cost of duplication, etc.

The report of the Shipping Board (Ex. 83) sets forth that Chace was the "only bidder," and that his "bid" of $2,940,000 was "much higher than (his) original bid," "and was only secured after long negotiations." These words "bidder" and "bid" show that the Shipping Board was fully alive to the requirement of the act limiting the board to a "competitive sale." Moreover, the reference to "long negotiations" might well carry the negotiations from March, 1922, when they were consummated, back to November, 1921, when Chace was arranging that the oil enterprise should not become a "bidder." The board sought, but did not obtain, competition.

Reverting to the contentions now made by the committee: They strenuously urge that the oil enterprise had a real need of *owning* tankers; that chartering was too risky. Granting this, the oil enterprise was a prospective bidder for the government's tankers. The committee also urge that the Tanker Syndicate, because it had apparently sunk some money in the second mortgage bonds, was also a prospective bidder at a "competitive sale" of those tankers.

The gist of the situation therefore was that two potentially competitive bidders for these tankers agreed not to compete; agreed to conceal from the government their suppression of competition; agreed that the real purchaser should in any event pay in full for the worthless second mortgage bonds, plus a bonus; and also should pay (if the government should ascertain the facts and stand on its rights [8 F.(2d) 406] the first mortgage of over $13,500,000. The contract for dividing the expected profits accruing from concealing from the government the suppression of competition was the main contract (cut, as is claimed, to $8,451,000) for the purchase of the tankers by the oil enterprise. This is claimed to have been the tanker contract outstanding when the receivership was constituted. This was the agreement which the committee concealed from the court and from their depositing cestuis, and adopted and effected in the reorganization.

The creditors contend that this transaction falls under the doctrine elaborately enunciated by the Supreme Court in McMullen v. Hoffman, 174 U. S. 639, 19 S. Ct. 839, 43 L. Ed. 1117. Portland, Or., had invited competitive bids for the construction of an extension to its water supply. McMullen and Hoffman were prospective bidders. But, on conference, they agreed that each should put in separate bid, but that they should have a common interest in each bid if either was accepted. "This community of interest was to be * * * concealed from all persons, including the water committee." 174 U. S. 645, 19 S. Ct. 842. There were eight bidders. Hoffman's was the lowest. The court below found his profits were $140,000. McMullen sued Hoffman to recover half these profits. But the Supreme Court held that this agreement to suppress competition, concealing from the public authorities the suppression, and dividing the profits accruing from such a community of interest, was illegal and that the court would not enforce any alleged rights springing from such contract. "Melior conditio possidentis."

Clearly, that case differs from the one at

bar only in that in the McMullen Case there was public bidding and that both parties made, in form, bids for this public work. But the gist of the wrong done to the public lay in the concealment of the suppression of competition between potentially competitive bidders. McMullen and Hoffman both wanted the job—precisely as in this case it is argued that the oil concern and the Tanker Syndicate both wanted to purchase these tankers at a bargain. If McMullen and Hoffman had not combined and concealed their combination, both might have been real competitive bidders for the job.

[12] On all the evidence this court is constrained to find and rule, as requested by counsel for the creditors, that the contract between the refining company guaranteed by the oil corporation, was tainted by fraud upon the government and could not have been enforced by the Tanker Syndicate against either company; that the case falls within the principle of McMullen v. Hoffman, 174 U. S. 639, 19 S. Ct. 839, 43 L. Ed. 1117.

Assuming the soundness of the committee's own claims that ownership of the tankers was indispensable to the financial safety and prosperity of the oil enterprise, counsel for the committee have been unable to present any plausible reason why competent and honest directors of the oil enterprise should not have dealt directly with the Shipping Board. There is nothing in the contention that the board had power or disposition to treat Chace as "a preferred purchaser." On the facts shown on this record, the oil company, not Chace, was entitled to preference; for under section 7 of the Merchant Marine Act of 1920 (Comp. St. Ann. Supp. 1923, § 8146¼cc) preference in such sales was to be given to citizens then maintaining a marine service approved by the board. The oil enterprise could, apparently, qualify under that section. There is nothing to indicate that Chace could.

The foregoing goes upon the hypothesis that the real contract was as counsel for the committee argue it; that is, that the price should be cut if negotiations with the Shipping Board were successful. Indeed, counsel seem to regard an implied stipulation to reduce the price as a necessary condition for even contending that the contract was legally enforceable; or, conversely, to concede that if the real contract had been to pay $17,271,000, it would have been obviously unconscionable, fraudulent and unenforceable. This court adheres to the finding in the former opinion that the contract was, unless voidable, enforceable for the entire amount. 8 F.(2d)

405. But this court accepts the apparent concession of counsel for the committee that such contract to pay $17,271,000 for tankers (then, as both parties to the contract agreed worth less than half that sum) was voidable as a fraud upon the stockholders of the refining company. The result is that whether the contract be taken as it was written, or taken as modified by the "understanding," it was voidable. Moreover, all the chief parties interested in it knew or were bound to know that it was voidable.

It is significant that the report of the Shipping Board to the Senate (Ex. 83) was made on January 10, 1923, just as the committee were admitted as parties to this case. 8 F.(2d) 399. The committee, of course, then knew that Chace's dealings with the board had been brought in question, with this report as a result. They also knew that if this report were known to this court their plan of paying $8,451,000 for these tankers and approving the "cost of acquiring the contract" over $500,000 would be effectually ended.

Concealment must in those days in January, 1923, have been a serious and anxious problem to the Tanker Syndicate and its coadjutors of the committee. At that time the oil companies had (or had used) about $800,000 of the $1,300,000 loan; Smith's concern was guarantor of the $520,000 note issue. The oil companies had possession of the tankers, representing a further investment of about $3,000,000; the tanker contract was fraudulent and unenforceable; potior conditio possidentis. About $4,000,000 of new money was thus at risk in a scheme of fraud, when this report to the Senate became public and added to the danger that the court would learn the truth. Under these circumstances, the motive to conceal and effectuate the scheme was very powerful. But large stakes do not make fraud legal or ethical.

It is to repeat that the concealment of this voidability and its effect as a fraud upon the rights of the noteholders—the chief beneficiaries of the trust controlled by this court—was the essence of the committee's undertaking and the gist of the present case. 8 F.(2d) 419. The committee adopted, concealed and completed a scheme of fraud.

In the former opinion, there was no flat finding as to the solvency of the receivership estate. Near the end of the opinion it was stated: "The committee, fiduciaries of the creditors and of this court, have had their full day in court; they have offered all the evidence they desired to offer as to the status and value of the estate they took, and their admin-

istration of it. Their administration was illegal and unfaithful. They have not suggested the insolvency of that estate. Whether they are estopped hereafter to suggest insolvency is a question not raised or argued. On it no opinion is intimated. They assert solvency. For present purposes that assertion stands." The committee have now set up in their answer filed on January 23, 1926, that the estate was insolvent. Counsel for the creditors object to the allowance of this answer as coming too late—and, what is more important, that, if allowed, it should not be construed as grounding a right to offer further evidence substantially equivalent to such as would arise on an allowed petition for rehearing. The answer is not too late. As stated in the former opinion, both sides offered all the evidence that they desired on the question of solvency, and this is not a rehearing. The answer may be treated as allowed in so far as it raises the issue of insolvency on the existing record, but not as a basis for a trial de novo. The question has been ably and exhaustively reargued on both sides, and has been most carefully considered by the court.

The court must determine this issue by a fair appraisal of the credible evidence. Mere suspicions of the soundness of the bookkeeping (8 F.[2d] 417)—perhaps increased by some of the proved wrongdoing of parties involved in the management of the enterprise —cannot be allowed to prejudice the rights of creditors to have the value of their interest determined in accordance with the fair preponderance of the evidence.

An outline of the evidence is necessary.

Palmer, a lawyer and business man of long and wide experience, particularly in corporate finance, was presented by counsel for the committee as their first witness, with a statement to the effect that he knew more about the situation than any other man. Palmer had been a director and member of the executive committee of one or more of the companies since November, 1920, as a result of the purchase by the United Fruit Company of $500,000 of the 8 per cent. notes, and an agreement that the Fruit Company participate in the expected output of the oil from the Venezuelan oil fields. Palmer testified explicitly that he regarded the receivership estate as solvent even if it had to pay the Island Oil judgment. Presumably his assertion of solvency was made on the basis of the revised tanker contract, about $8,500,000 and not on the basis of the original tanker contract for $17,271,000. Moreover, Palmer testified that the bill was before it was filed carefully reviewed by him;

in effect he adopted as his own evidence the strong allegations in the bill as to the prosperity and solvency of the Oil Corporation— the receivership estate.

At a meeting of the executive committee of the refining company, held May 26, 1922, present, Cochrane, Chace, Palmer, Perkins, Farley, Howland; also present F. R. Hart and George W. Treat, the Island Oil verdict and its effect on both corporations was discussed. Chace left the meeting. It was then resolved that a recommendation be made to the board of directors that a dividend of $1,000,000 be declared, payable May 26, 1922, to stockholders of record that day.

This vote amounts to an assertion, to which Hart's assent is indicated, that the refining company was (less than two months before the receivership) earning such profits as to warrant it in declaring an immediate dividend of $13\frac{1}{3}$ per cent. on the $7,500,000 refining company stock.

In the summer and fall of 1922, a critical examination was made of the financial status of the enterprise, pending negotiations with an outside banking concern for a reorganization. About that time Smith made through his own experts, an examination of the earnings, plant, etc., in contemplation of preparing, as he did prepare, his (or the Tanker Syndicate's) plan of reorganizing the concern. From the data thus carefully checked up by experts, as well as by the officers of the oil enterprise, was prepared a bond circular for Smith's use in Europe, whither he went about November 10, 1922, to feel out the market for the prospective second mortgage bond issue. The circular referred to in the former opinion as dated March, 1923 (8 F. [2d] 415) was, as careful re-examination of the evidence has now shown, but a slightly revised edition of circulars (Exs. 15 and 15A) prepared not later than early November, 1922. In this preparation Smith, Palmer, and Hart took the lead. A little later Hart gave this circular some circulation. It is an important part of the evidence on this important issue. A copy of it, with the certificate attached (Ex. 15) of the president, vice president, and treasurer, is therefore set forth as an appendix to this opinion. For the representations therein all members of the committee were or became responsible. The statements therein were their own representations—made as responsible bankers, of the value of the properties, and of the earnings for 1921 and 1922—on which they sought from the investing public new capital to be secured by a second mortgage only.

The circular goes on the assumption that the proposed second mortgage for $5,000,000 had been issued, and the proceeds, $4,250,000 applied.

Summarized, this circular asserts in emphasizing capitals that *"The actual investment in the property is in excess of $20,000,000."* It states the value of the refining plant as over $10,000,000; the quick assets as $4,370,176.44, the quick liabilities as only $706,143.17, making net quick assets $3,664,033.27. It shows an entire indebtedness, funded and unfunded, of $10,420,143.17, only about half the alleged cash investment in the property, and just about equal to the alleged value of the refining company's plant; and (perhaps, most important) it shows earnings applicable to interest, depreciation, and taxes of about $3,500,000 a year, to meet maximum (but falling) requirements on both mortgages of only $1,170,000; $2,330,000 would thus be left available for taxes, depreciation, and dividends on the $7,500,000 par of the Refining Company stock; without counting any returns from the oil fields, which were carried in the asset column at $2,500,000—raised in the circular of March, 1923, to $5,000,000.

On this showing, obviously dividends of 10 per cent. ($750,000) to 20 per cent. ($1,500,000) could safely be paid on the stock of the Refining Company. This should have given it a market value of at least par ($7,500,000) apart from the increased value which would accrue to the holding company from prospective large profits from a successful development of the Venezuelan oil fields. The claims proved and allowed against the receivership estate were about $6,500,000, about $1,000,000 less than the par of the stock of the Refining Company.

Plainly, if the stock of the refining company was worth par, disregarding the oil fields, the estate was solvent; creditors were entitled, in some form, to full payment. Compare Phipps v. R. R. (C. C. A.) 284 F. 945, 28 A. L. R. 1184.

But the Venezuelan oil fields cannot be disregarded. If the court had been impelled to liquidate the concern, these fields, with their very large possible profits, would have attracted buyers, and increased the available price; kept and successfully developed, these fields might easily have made even the stock of the holding company of great value.

In this circular, the tankers are not treated as an asset, or their use as a factor increasing the earnings. Their alleged purchase is said to represent "no more than the company would have had to pay in chartering ships." It follows that, dispensing with the tankers, the committee represented the enterprise as having assets of more than 2 to 1, and earnings (compared with interest on the bonds) nearly 7 to 1.

Cochrane testified to the effect that the statements in his letter of February 28, 1923, incorporated in the bond prospectus (8 F. [2d] 415), were true. Whatever may be thought of the value there put on the Fall River land, Cochrane's evidence as to the vital item of earnings cannot be entirely disregarded. Comerford and Treat gave evidence in general accord. There was no opinion evidence to the contrary.

Such, in brief, was the financial status of the holding company,—as it was represented to this court for the purpose of obtaining a receivership, and to the investing public by (or with the full approval of) this committee for the purpose of getting in new capital for its alleged prosperously expanding business.

But on the Price-Waterhouse reports, referred to in the bond circular (reports which, of course, such a committee of leading bankers examined critically before approving the representations made to prospective bond purchasers), counsel for the committee have now grounded a very extraordinary argument. They contend that these reports show not only that no capital was ever raised for the enterprise except by borrowed money (which is undoubtedly so); but that it really never had any annual net earnings, except perhaps in 1921. It follows, if this argument be accepted, that the statement in the bond circular that, "The actual investment in the property is in excess of $20,000,000," was grossly and intentionally false. For if there was such investment of over $20,000,000, about two-fifths of it was derived from net earnings. In brief, it is now contended that even if the committee were technically liable, there was no great damage to the creditors, because their original rights were of little value.

Fairly analyzed, the Price-Waterhouse reports do not sustain this argument. Probably they do show that certain of the earnings reported were not, as the bond circular indicated, available for interest, taxes and depreciation; that, in part, such earnings were absorbed by losses on Mexican oil fields. But to stretch the word "depreciation" to cover losses in unsuccessful exploitation is far less unjustifiable than to mark up Fall River land over ten times, in order to sell an interest therein to Scotch bond purchasers. The gist

of the most important representations is as to earning power; and these reports do not show that the concern did not have substantially as represented, a rapidly increasing business in the purchase, refining, and sale of oil, producing very large earnings.

Coupled with this argument that the concern was insolvent runs an elaborate argument that the tanker contract (as revised) was a needed, wise, and highly beneficial contract; that, without owning a transportation system, the concern would have been at the mercy of fluctuating rates; and that buying these tankers for the alleged revised price of $8,451,000, payable in installments running 15 years, with interest at 7 per cent.—the company, which was, as is contended, getting money on its funded debt at the rate of 10.184 per cent., would, during 15 years, save $2,178,423.41. This is an ingenious computation. A much more pertinent one would have been (assuming that the concern needed to own tankers) to figure their cost if bought from the government for $2,940,000, payable in 15 years, interest at 5 per cent., which was what the government was receiving on its first mortgage. The Shipping Board reported to the Senate on January 10, 1923, just as this scheme was put before this court, that it had "84 tankers which it cannot sell at $45 per ton." If this report had been brought to the court's attention, the committee's plan to pay the Tanker Syndicate over $100 a ton for tankers would have died instantly. But if the court had had trustworthy advice that the concern then within its control needed to buy tankers, it would have been in an excellent position to direct its receiver to apply to another federal tribunal for the preferential treatment contemplated by section 7 of the Merchant Marine Act of 1920; and section 5 *expressly* contemplates 15-year installments.

On first impression, the question of solvency seems to be involved with the validity or invalidity of the tanker contract. But, on analysis, and in the light of the committee's own contentions, this is not so. Solvency must be determined under the conditions obtaining prior to the approval of the plan by the decree of February 17, 1923. At that time the refining company had possession of the tankers. There was an outstanding contract which in form required the companies to pay $17,271,000 for the tankers. The contract or "understanding," as the committee now contend, was to pay only $8,451,000.

Parenthetically counsel for the committee now explain the absence of a stipulation evidencing the argued real agreement to cut the price from $17,271,000 to about half that sum (provided the government was induced to sell its first mortgage as was then contemplated for a fraction of $13,500,000 that it had invested) by asserting that with high-class business men of the type here involved, written contracts are of no import; that oral understandings are enough. On this assumption, this court has difficulty in understanding why it was thought necessary to pay counsel for the oil companies $15,000 (as their treasurer recalled it) for drafting a contract to pay double the price really (as is argued) agreed, and why the receiver reported that there was a claim on a Tanker contract of about $18,000,000. 8 F.(2d) 414.

The committee undertake to support the validity of this alleged revised contract by urging that the tankers were worth $8,451,000, and that therefore the revised contract was not only valid, but beneficial. But this court adheres to the finding in the former opinion—that on all the evidence the fair market value of these tankers did not exceed $3,000,000. 8 F.(2d) 406. This court has also found and ruled that the tanker contract, whether for $17,271,000 as it was actually written, or for $8,451,000 as the committee claim it to have been, was unenforceable. It was therefore not a real liability of the oil companies. In one aspect, the tanker transaction was a net asset of the oil enterprise; for the concern then had possession of the tankers, and of the money loaned, $800,000 to procure the contract. Counsel for the committee concedes that no action could have been maintained to recover money loaned to bribe directors of the oil companies to contract away their stockholders' property. McMullen v. Hoffman, 174 U. S. 639, 19 S. Ct. 839, 43 L. Ed. 1117. Plainly the principle potior conditio possidentis, always applicable to parties engaged in such a scheme of fraud, left the Tanker Syndicate, prior to the reorganization, in an exceedingly precarious situation, both as to recovering their loan and as to repossessing themselves of the tankers.

To recapitulate: As the committee contend that the real tanker contract was for $8,451,000 and not for $17,271,000, and that this revised contract was valid *because* the tankers were worth the contract price, they do **not** and cannot contend that this contract if valid, rendered the receivership estate insolvent. It follows that if the contract, as the committee claim, had been enforceable, its enforcement would not have diminished the net value of the receivership estate. If, on the other

hand, the finding and ruling herein made (that the contract was unenforceable) stand, then the oil enterprise was in a position (potior conditio possidentis) to recoup from the Tanker Syndicate at least the amount of the loan intended and used to bribe the directors of the oil company—to transmute the tanker transaction from a liability into an asset.

Unsound is also the contention of the committee that the test of solvency was the ability of the concern to liquidate and pay the holding company debts in full. The concern had been put into court in order to prevent a forced liquidation, or any liquidation, if the interest of the creditors so required. Phipps v. R. R. (C. C. A.) 284 F. 945, 28 A. L. R. 1184. A reorganization for the benefit of the real owners was as feasible as the reorganization effected for the benefit of losers (or speculators) in tanker second mortgage bonds. Freed from the incubus of the tanker involvement and given an honest and competent management, the concern was in good condition. A close approximate to its status, so freed, may be made by taking the consolidated balance sheet, of October 31, 1922 (a date exactly appropriate) attached to the receiver's first report and printed in the margin (8 F.[2d] 396), and cutting out tanker items, inflations, and mere bookkeeping entries. Coming thus to realities, the result would be approximately as follows:

| Assets | | Debts | |
|---|---|---|---|
| Land at cost..$ | 225,025.36 | Ten yr. mtg. bonds on Refinery ....$ | 4,715,000.00 |
| Refinery, etc., less reserve for depreciation ........ | 10,201,991.40 | 7% serial notes due quarterly in 20 instalments beginning Apr. 1, 1922 ...... | |
| Oil properties per appraisal ......... | 1,712,500.00 | | 442,000.00 |
| Current assets | 3,237,064.48 | Current liabilities ..... | 2,776,494.36 |
| | $15,376,581.24 | | $7,933,494.36 |
| Add debts due from Holding Co. only: | | | |
| Island Oil judgment............. | | | 941,000.00 |
| 8% notes ..................... | | | 5,440,000.00 |
| | | | $14,314,494.36 |

From this it appears:

(a) There was a balance of current assets over current liabilities of....... 460,570.12

(b) All the other debts of the refining company were funded.

(c) The noteholders and Island Oil Company had only the holding company as debtor. It follows that nearly 45% of the gross debts were thus in financial result stock of the subsidiaries and could have been so dealt with in a reorganization, as they were.

(d) The balance of the refining company's assets over liabilities is........ 7,442,085.08

(e) The debts of the holding company were ..................... 6,381,000.00

$1,061,085.08

This left a net value of over $1,000,000 of assets over the liabilities even on the assumption that the holding company as potential stockholder of the subsidiary companies had determined to liquidate the subsidiaries.

Of course, in determining the value of this, or of any other going concern, the amount of earnings is the most vital single factor. Clearly, if the earnings were anything like the representations made by the committee, a concern having these assets and liabilities was a sound and prosperous concern. At any rate, the debts of $6,500,000, of the holding company, based on the stocks of the subsidiaries, were good.

[13] However the controlling facts are analyzed (and this court has made many other computations), the result is solvency—under proper administration.

Mr. Finsthwait has appeared by separate counsel and addressed a long argument, oral and written, to the effect that on this record he ought not to be held. But on careful reconsideration, this court adheres to the views to which it was constrained in preparing the former opinion. The committee acted as a unit. They have continued to act as a unit,—with the single exception of Mr. Finsthwait's appearance by separate counsel for this reargument.

[14] His counsel urge, appropriately enough, expressions by the court during the trial, to the effect that Mr. Finsthwait did not seem to have intentionally participated in any fraud or breach of duty. Perhaps some of these expressions, made before the court had really grasped the tanker transaction, were premature and somewhat overstated. At any rate, on a study of the record and of the authorities last summer, this court was forced to the conclusion that, however reluctant Finsthwait was to assent to a scheme which he was bound to know was wrong, he did assent. As the case now stands, after reargument and reconsideration, the tanker transaction was, as this court is compelled to hold, a transaction so glaringly fraudulent that Finsthwait cannot, even on the theories that his counsel argue so ably, justify himself for his failure to see that the whole situation was fully disclosed to the court.

The essentials and most of the details of the real scheme were discussed and approved at the preliminary meeting of the committee on November 17, 1922. 8 F.(2d) 411. But the plan indicated in the circular of November 21, 1922 (8 F.[2d] 411, 412) to the noteholders, and shortly thereafter printed and filed in court, bore but a remote and almost

negligible resemblance to the real plan discussed on November 17. The plan presented to the court and to the creditors, so far as it ever reached them (8 F.[2d] 413, 414), was a disguise, not a disclosure, of the real plan. This Finsthwait and every other member of the committee knew. 8 F.(2d) 414.

The simple truth is, as stated in the former opinion, that Finsthwait, in spite of a desire to do right, preferred to assent to a plan that he was bound to know, and did know, was wrong, rather than break with his associates, resign from the committee, or expose the situation to the court.

Aiken and West have filed motions, supported by affidavits, which seem to call for no comment, beyond saying that, in the absence of petitions for rehearing, these motions give them no standing. They, too, stand with their associates on the committee. The court is not called upon to speculate as to the motives which have caused them to refrain from filing petitions for rehearing—if they in reality think that they could, on a rehearing, to any degree better their position.

It is not a pleasant duty to find that men of generally good standing lent their names and activities to a scheme of fraud. But the facts material for the determination of rights now in issue must be found and these men must be judged by what they did. Their general standing and apparent lack of the common personal motives that lead to wrongdoing are material only in requiring unusual care that the controlling facts be found fully proved. To that end, this court has heard the case at extraordinary length, and has studied the record with scrupulous care. It is proved beyond a reasonable doubt that the fundamental and controlling purpose of the scheme, before the receivership and of the reorganization, was to appropriate the property rights of some 600 to 700 scattered investors in the 8 per cent. notes (who furnished about $3,000,000 of real money), to the Tanker Syndicate. 8 F.(2d) 406, 407. The attitude of those dominant in the undertaking was one of cynical and ruthless disregard of the rights of these scattered investors. Manifestly, except for the unforeseen accident of the Island Oil judgment, necessitating a resort to the court, these noteholders (real investors in this enterprise), would have been expropriated without the slightest chance of their learning where their money had gone.

[15] Stress is laid upon the hardship of imposing a large liability upon fiduciaries who did not appropriate to themselves any large part of the maladministered trust estate. But the law looks to the safety of the trust estate, not to the profit or the loss of unfaithful fiduciaries. So far as the beneficial owners are concerned, the damage is as great when fiduciaries divert the estate to third parties, as when it is misappropriated by the fiduciaries themselves. The committee have made no attempt to cause other parties to the wrongdoing, including the chief recipients of the property diverted from its real owners to be joined as codefendants. No reason appears why the Tanker Syndicate might not have been joined as a codefendant if the committee had so desired. In re Metropolitan Ry. Receivership, 208 U. S. 90, 111, 28 S. Ct. 219, 52 L. Ed. 403. What recourse, if any, the committee, or any member of it, may have against any of the wrongdoers not now parties before this court, is not for this court to consider. But it is the plain and inescapable duty of this court to make it clear that its powers are not to be used as an instrumentality for concealing and effectuating such a scheme of fraud.

It remains to deal with the nature and scope of the remedy. This problem may be viewed in two aspects:

(1) From the standpoint of the damage done the solvent receivership estate, in its entirety, by the maladministration of the committee, who were quasi receivers.

(2) As a wrong done merely to the creditors now in court by the committee as fiduciaries.

This difference in approach may possibly be material in determining the ultimate incidence of the large expenses incurred by creditors in the attempt to obtain the rights to which they were entitled without expense at the hands of the committee.

(1) Clearly, the rights of creditors now in court were originally rights against the receivership estate. In that aspect, the first step is to assume repayment into the receivership estate of the full amount of the damage done. Starting thus, plainly the wrongful diversion from this solvent receivership estate (mainly to the Tanker Syndicate) greatly exceeded the amount of claims of creditors now in court. Roughly, that damage consisted of the loss to the reorganized concern from the adopted purchase for $8,451,000 of tankers worth only $3,000,000, plus about $500,000 more paid Smith and/or Chace for marketing the second mortgage bonds, plus improper counsel fees, plus other minor items, an aggregate of over $6,000,000. Compare the analysis in 8 F.(2d) 414, 418.

This finding is not inconsistent with the

finding of solvency supra; for it goes upon the assumption that the stocks, preferred and common, of the reorganized refining company, allotted to creditors, were of some value and are still outstanding. The damage accruing from the maladministration was, therefore, not measured by the amount of the creditors' claims, about $6,500,000. This finding also assumes, contrary to the fact (8 F.[2d] 410, 412), the second mortgage bond issue legitimate. While accurate analysis of the elements of damage is neither necessary nor on this record possible, this rough outline understates the amount of that damage.

That the problem of remedy should be approached from the standpoint of the damage done seems to have been the view of the Court of Appeals in the mandamus case (9 F.[2d] 344, 347). There that court says that these proceedings were "brought by permission of the court to cover into that estate a sum of money sufficient to compensate it for damages it sustained at the hands of the noteholders' committee, out of which parties ultimately interested in the estate, and who have not participated or acquiesced in the fraud, may be compensated," and "after the damage sustained is covered into the estate, it will go to creditors of the estate who have not consented to the fraud, and any balance will belong to the stockholders of the Oil Corporation, on their obtaining a like modification of the decree of February 17 as respects them."

For present purposes, then, the damage may be regarded as determined to have been not less than $6,000,000, and to have been paid by the committee to the receiver. On this hypothesis, obviously the primary charge on the restored solvent receivership estate would be the expenses of the administration, including the expenses properly incurred by Wiltsee and the intervening creditors in restoring the estate.

But, as only a part of the creditors have, after due notice, come in, and as none of the stockholders now appear entitled or to desire to seek relief in these proceedings, there seems to be no legal or practical reason why the amount of damage collected may not be limited to the amount of claims of creditors now in court, plus the expenses caused by the maladministration. This theory treats non-intervening creditors and stockholders as having already received their full share of the restored receivership estate, or as content with what they have received. Certainly the committee can have no cause to complain of this theory. It is in some aspects like Von Arnim v. American Tube Works, 188 Mass. 515, 519, 74 N. E. 680.

Perhaps it should be added that this conclusion is limited to these proceedings and is without prejudice to the rights of any non-intervening creditors and of any stockholders who may hereafter, in any other appropriate proceedings, assert and be held entitled to assert, rights against the committee.

(2) But if we turn to the second aspect, and regard the gist of these proceedings as a suit by the creditors as cestuis against the committee as trustees, then conceivably the recovery may be held limited to the amount to which the creditors are themselves entitled, not including their expenses for counsel fees and disbursements in the litigation. Ordinarily, of course, costs do not include the real counsel fees of the prevailing party. Undoubtedly the committee were the trustees of the creditors, both under the assignments of all creditors (but Wiltsee) to their nominee, and under the decrees admitting the committee as parties and approving their plan of reorganization.

These decrees gave the committee effective control of the entire trust estate, so that the case is in many aspects like that of wronged cestuis proceeding against wrongdoing probate court trustees for maladministration of a trust estate consisting of the ordinary variety of stocks, bonds, and other forms of property. [16] On careful consideration, this court is of the opinion that the decree should run on the theory first stated, and in accordance with the views indicated by the Court of Appeals. The reverse conclusion would involve treating the estate as insolvent when it was solvent. Clearly, creditors of a restored solvent estate are entitled to have their claims paid in full.

The large expenses incurred by the creditors in this litigation were due entirely to the wrongdoing of the fiduciaries whom they and this court intrusted with the administration of this estate. To hold that the creditors of a solvent trust estate should be required to litigate at their own expense, perhaps for years, in order to compel their fiduciaries to restore that estate and thus to give creditors the equivalent of what these fiduciaries were bound to give them without expense, would be a lame and impotent conclusion. Such a doctrine would put a premium on wrongdoing by fiduciaries; for it would enable them to prolong expensive litigation in the hope of discouraging or crippling their complaining victims.

Support for this view is also found in the result reached in the Sixth circuit in the case of Haines v. Buckeye Wheel Co., 224 F. 289, 298, 139 C. C. A. 525, where that court dealt

with maladministration by a receiver. It was there held that the intervening creditors who had assumed the burden of litigating the receiver's wrongdoing were entitled to exoneration from the approved expenses so incurred. Another case lending some support to this view is that of Tevander v. Ruysdael, 299 F. 746, 749–752, in the Seventh circuit.

[17] On principle and authority, therefore, this court holds that the committee must be held to restore to the receivership estate the damage done by them to the amount necessary to give all creditors now in court the equivalence of the rights they would have received under proper administration.

But if, in the court above, it should be held that expenses of the litigation may not legally or properly be thus covered into the fund, it is clear that those expenses should be prorated upon all creditors who obtain relief in these proceedings. Trustees v. Greenough, 105 U. S. 527, 26 L. Ed. 1157; Central R. R. Co. v. Pettus, 113 U. S. 116, 5 S. Ct. 387, 28 L. Ed. 915; Am. Engineering Co. v. Metropolitan, etc., Co. (C. C. A.) 275 F. 40.

In either aspect it is necessary for this court to deal with the amount of counsel fees and other expenses incurred by Wiltsee and the intervening creditors. This problem involves, as is usual in cases of counsel fees, questions of doubt and difficulty. The claims run into very large amounts. Counsel for the committee have, however, agreed in open court that the statements as to the amount of time spent by the various counsel for creditors and their expenses incurred, as set forth in their specifications filed on April 8, 1926, shall be taken by the court to be true. Summarizing the facts thus shown in addition to those of which the court has judicial knowledge, the result is:

Sherman L. Whipple and Frederick Foster, original counsel for Wiltsee, have, with their associates, incurred expenses (mostly for stenographers' bills) of $5,065.72, and have spent in and out of court an aggregate of about 577 days. They estimate the value of the professional services of their entire group as $150,000. In addition to Wiltsee's original claim, Messrs. Whipple and Foster et al. represent intervening creditors whose claims aggregate, without interest, about $215,000. Adding Wiltsee's claim of $176,000, the aggregate represented by these attorneys is about $617,000.

Messrs. Hill, Barlow & Homans and their associate New York counsel appear for the Island Oil Marketing Company whose claims aggregate $945,600. Their disbursements are $1,295.31. They have spent about 215 days in and out of court, and estimate their services as worth $50,000.

Romney Spring, Esq., and associates appear for 34 creditors whose claims aggregate $61,000. They have disbursements of $19.06. They have spent about 45 days on the matters, and estimate their services as worth $10,000.

Lincoln Bryant, Esq., appearing for a single creditor whose claim is $20,000, spent about 19 days in and out of court, had no expenses, and estimates his services as worth $2,500.

This is an aggregate of $212,500 sought for counsel fees. The disbursements, aggregating $6,380.09, should, of course, be allowed.

These claims for counsel fees are, from old-fashioned standpoints, very large. But it is necessary in these days for courts to revise views as to counsel fees, sound enough some years ago. The overhead expenses of law offices have increased enormously within the last few years. Moreover, in this case, without fault on the part of counsel for the creditors, the trial has taken an inordinate amount of time, in substantial part because this court was determined that the committee should have an unlimited opportunity to justify their conduct.

All counsel on both sides agree that in assessing fees the larger merit accrues to Mr. Whipple and his associates who, for the single claim of Ernest Wiltsee, initiated the proceedings and alone brought them to the stage shown by the opinion of October 3, 1925. Plainly, professional duties of that pioneering kind are of a higher order than those required of other counsel in determining whether they should advise their clients to intervene and, having intervened, in participating in the argument to sustain and amplify the findings already made.

[18] But, without elaborating doubts and difficulties, it is necessary for this court to reach a conclusion. On the whole, the conclusion is that the suggested aggregate of counsel fees, $212,500, is too high. One basis of comparison will be found in the fees approved by the committee for counsel in the reorganization. The work involved in the reorganization was substantially all done in about eight months; it involved almost no proceedings in court; and no contested matter except the opposition to Wiltsee's just claim. 3 F.(2d) 424. It was in most respects not comparable as a professional performance, either in amount or in merit, with the work done by all the counsel for the creditors in this case. The committee approved of counsel fees of $140,000. They, at least, can have no standing to

complain of this court's awarding a like amount to counsel who have exposed their maladministration, in litigation which has involved 50 to 60 days in sharply contested court proceedings, with a record of nearly. 6,000 pages, besides one appeal already briefed and argued in the court above.

Starting, then, upon the basis of gross counsel fees of $140,000, this court finds and rules that there should be allowed

| | |
|---|---:|
| To Sherman L. Whipple and his associates | $110,000 |
| To Hill, Barlow & Homans and their associates,—counsel for the Island Oil Marketing Co. | 24,000 |
| To Romney Spring, Esq. | 4,500 |
| To Lincoln Bryant, Esq. | 1,500 |
| | $140,000 |

The award now made is without prejudice to the rights of counsel to apply for a further allowance if, as is obviously contemplated, this case is taken to the Court of Appeals. It is also without prejudice to any additional rights counsel may have as against their own clients. This is particularly applicable to counsel for the Island Oil Marketing Company, which is in the hands of receivers. This court will make no ruling encroaching to the slightest degree upon the functions of the court in charge of that receivership.

The proceedings have also required extensive and valuable services on the part of the receiver and his office forces, together with disbursements of $961.55. His petition for compensation and for disbursements must be allowed; the value of the services is determined at $6,500. Decree may run accordingly, primarily against the Refining Company (8 F.[2d] 420); but the total amount must be included as a charge upon the hypothetically restored solvent receivership estate, like the other expenses caused by the maladministration. Leave is reserved to apply for allowances for future services and expenses.

Possibly it should be added that the word "rescind" as used in the former opinion and in the decree of December 14, 1925, should not be misinterpreted or misapplied. The right to rescind as there used obviously means merely the right of creditors to reassert claims which, by invalid methods, they were induced to settle by receiving stocks of a value much less than the value of their claims under legal and faithful administration. There can be no rescission in the sense of restoring the status quo; for, as pointed out in the former opinion (8 F.[2d] 421), "The recapitalized Refining Company, with its second mortgage bond issue and its voting trust, is an accomplished fact;" and it is therefore "impossible for the court now to remit creditors to rights against stock, or against the proceeds of stock, having any reasonably approximate relation to the stock of the refining company when the committee obtained control of it." Equivalence, not restoration of the status quo, is the quest; and the start is with a solvent estate,—100 per cent.

[19] In determining equivalence, it is plain that wronged cestuis are not required to keep the stocks which their trustees never had a right to induce them to take. But tender of such stocks for the benefit of the committee is not a condition precedent to recognition of rights against the committee. With or without such tender, intervening creditors are entitled to relief—to equivalence. Mutatis mutandis, this principle settles the amounts due all intervening creditors.

It follows: Creditors tendering through the receiver to the committee the stocks received by them, or the equivalent thereof, become thus entitled to recover from the committee the full amount of their claims; creditors who have tendered no stocks, but sold their stocks in market overt, must credit the amounts thus received, and may recover the balance; the same principle governs as to creditors who sold part of their stocks and whether they did or did not repurchase and make tender, in whole or in part, with the necessary interest adjustments.

The facts relative to the varying status of intervening creditors have been ascertained and set forth by a wise and economical method. Counsel agreed in open court that, after conference with them, the receiver should file a report stating the names and amounts of claims of such creditors, and any special facts grounding contentions for or against the right of such creditors to relief; and that such report should, in its statements of fact, be taken as true. Such report, accompanied by an identifying stipulation signed by counsel, has been filed. The facts therein set forth may be regarded as incorporated in this opinion so far as necessary for the determination of the rights of the parties.

At the end of the hearing counsel for the committee conceded that no intervening creditor is disentitled to relief because of participation or acquiescence in the fraud.

[20] Creditors holding the 8 per cent. notes due on June 1, 1925, claim, and are entitled to, interest at 8 per cent. until the due date of their notes, and 6 per cent. thereafter, under the rule laid down in American Manufacturing Co. v. Railway Co., 233 U. S. 261, 267, 34 S. Ct. 502, 58 L. Ed. 949. Wrongdoing trustees are also held to pay interest

compounded with semiannual rests. Walker v. Walker, 9 Wall. 743, 756, 19 L. Ed. 814; McKim v. Hibbard, 142 Mass. 422, 8 N. E. 152.

Some minor questions as to creditors' rights may be left to be dealt with when the final decree is settled.

The general result is that a decree must be entered against the committee, jointly and severally, requiring them to pay to the receiver the amount found due in accordance with the rulings and findings stated above. The receiver will, on such payment by the committee, transfer the stocks held by him to them or their nominees, and will make prompt distribution of the fund to the parties entitled thereto.

Decree accordingly.

## Appendix.

We certify that all statements in this circular, each page of which is identified by the initials of the undersigned, are correct. We do not pass on or approve any statements concerning any legal status or upon matters that are left in the discretion of the bankers to modify, and our certification is limited to statements of actual facts in relation to values, assets, liabilities, earnings, and actual operating data. [Signed]

F. Douglas Cochrane, Pres.,
Gaspar G. Bacon, Vice President.
Samuel Vaughan, Treasurer,
All of New England Oil Refining Co.

Pennsylvania four-mill tax paid.

$5,000,000. Series A.

New England Oil Refining Corporation of Boston, Mass.

General Mortgage 8% Sinking Fund Gold Bonds.

Dated January 1, 1923. Due January 1, 1943. Redeemable on any interest date, on 90 days' written notice to the trustee, at 105, and accrued interest. Coupon bonds of $1,000 and $500 each, with privilege of registration as to principal. Principal and semiannual interest payable at the Old Colony Trust Company, Boston, and Continental & Commercial National Bank, Chicago.

Old Colony Trust Company, Boston, Trustee.

Interest payable without deduction for federal income tax, but not in excess of 2%.

### Capitalization.

| | Authorized. | Outstanding. |
|---|---|---|
| First mortgage 8% bonds (closed mortgage) | $5,000,000.00 | $4,715,000.00 |
| General mortgage bonds | 20,000,000.00 | 5,000,000.00 |
| Preferred stock, 7%, cumulative after 3 years | 8,000,000.00 | 6,000,000.00 |
| Common stock— No par value | 1,100,000 shrs. | 600,000 or 750,000 shrs. |

### Lien.

Through deposit with the trustee of the entire capital stock of New England Oil Corporation, Limited, these bonds are a first lien on 250,000 acres of oil concessions in Venezuela, valued at $2,500,000. They are also a first mortgage upon 497 acres of land valued at $994,000, located on deep water on the Taunton river, three and one-half miles above the company's plant at Fall River. Additional storage facilities for the company's plant will necessarily be made on these lands and these bonds will be a first mortgage on all docks, tanks, and other improvements as and when erected, together with the pipe line connecting this property with the refinery at Fall River. The bonds are also a direct mortgage on the refinery itself, subject to a prior lien of $4,715,000 maturing semiannually until March 1, 1931.

### Disposition.

| | |
|---|---|
| Now issued for the purpose of supplying the company with additional working capital | $ 5,000,000.00 |
| Reserved for retiring first mortgage bonds as they mature | 4,715,000.00 |
| Reserved for the construction of additional plant and acquisition of additional fixed assets at a rate not to exceed 50% of the actual cash cost of same and under conservative restrictions as to earnings | 10,285,000.00 |
| | $20,000,000.00 |

The reserved bonds, if issued, shall bear such rate of interest, not exceeding 8%, as the board of directors may determine.

F. D. C.
S. V.
C. G. Bacon.

### Valuation of Assets.

| | |
|---|---|
| Land as appraised | $ 2,642,576.00 |
| Plant | 10,150,334.35 |
| Oil lands, as appraised | 2,500,000.00 |
| Contract for marine equipment | 1,107,778.00 |
| Net quick assets | 3,664,033.27 |
| Other assets | 252,986.36 |
| Total assets | $20,317,707.98 |

The company has no indebtedness other than its bonds and its current operating accounts and accruals. The actual investment in the property is in excess of $20,000,000.

### Earnings.

The company's earnings available for depreciation, interest, state and federal taxes, as certified by Price, Waterhouse & Company, for the year 1921 were.. $3,508,805.75

On the same basis earnings for 1922, with three months estimated, will be.............. 3,500,000.00

Annual reserve necessary to retire first mortgage bonds, principal and interest .......... 770,000.00

Leaving a balance for the general mortgage bonds of .......... 2,730,000.00

To protect a maximum interest charge of................... 400,000.00

These earnings have been made from the handling of 4,500,000 barrels of crude oil in the year 1921 and over 6,000,000 barrels in the year 1922. Upon the early completion of important extensions now being made, the refinery will be able to handle 10,000,000 barrels a year and should produce net earnings applicable to interest, depreciation and taxes of not less than $5,000,000 a year.

### Sinking Fund.

The mortgage securing these bonds provides that each year, beginning with the calendar year 1923, there shall be set aside from the company's net profits an amount equivalent to 20% of the net profits available for dividends, which shall be used by the trustee to purchase bonds in the open market at the best possible price obtainable, not exceeding 105 and accrued interest, any balance not so used to be applied to the redemption of bonds by lot on May 1st of each year, beginning May 1, 1924. It is estimated that not less than $500,000 will be available for sinking fund each year.

### Business.

The business of this company, which commenced active operations upon completion of its refinery early in 1921, is one of the largest and most important basic industries to be established in New England in many years and is believed to be a vital factor in insuring an adequate supply of oils necessary to the industries of this section.

Starting as a producer of fuel oil and gasoline and with the Navy Department of the United States government as its principal customer, the company now has a refining plant, producing all important petroleum products, including gasoline, kerosene, lubricants, fuel, oil, gas oil, road oils, and asphalts, which it distributes to over 160 customers, including some of the largest users of fuel oil in New England.

F. D. C.

G. G. B.

S. V.

The increase in the company's business since its inception is shown in the following schedule of products shipped:

1920 .................... 297,593 Barrels
1921 .................... 4,885,320 ".
1922 (3 months estimated). 6,000,000 "
1923 (estimated) ..........9,000,000 "

Based on contracts actually in hand and assured, production in 1923 will be in excess of 9,000,000 barrels.

The stability of supply, economy, cleanliness, and general desirability of oil as a fuel compared with coal has created a steadily increasing demand for this type of fuel, and this is especially true in New England where the bleaching of cotton demands the use of a fuel free from dirt and cinders. The market for all commercial oils in New England is increasing in substantial amounts every year, and being ideally located from the standpoint of distribution, the New England Oil Refining Corporation is in a position to command its full share of this increase.

### Plant.

The company owns and operates a modern tidewater refinery of the highest type of steel and concrete construction, covering 50 acres of land on the Taunton river, at Fall River, Mass., with a capacity of 30,000 barrels of crude oil a day.

The equipment is of the most modern type, including manufacturing facilities for producing all important petroleum products and complete equipment for distributing these products in large and small quantities by tank wagon, railroad car and vessel. The entire plant is protected against fire by a complete Foamite system and a system of high pressure hydrants.

The docks of the company at Fall River provide simultaneous facilities for four 12,000-ton tankers, while its terminal station at New Bedford covers 3 acres of land and includes a tidewater dock on a 25-foot channel. The company's steel tank storage facilities at Fall River and New Bedford are in excess of 1,000,000 barrels.

### Oil Lands.

Through its ownership of the entire capital stock of the New England Oil Corporation, Limited, which has been deposited with the trustee as additional security for these bonds, the company owns 250,000 acres of oil leases in the Maracaibo district of Venezuela. These concessions adjoin the holdings of the Standard Oil Company of Venezuela, and other important oil interests, and 60,000 acres of the company's holdings adjoin the already developed Mene Grande field, con-

trolled by the Caribbean Petroleum Company, which has been producing commercially since 1914, and is considered to have a great future. The New England Oil Corporation, Limited, has already expended over $1,500,000 in the exploration and development of these oil lands and it is confidently believed that this property in the near future will constitute a primary source of crude oil for the Fall River refinery.

### Balance Sheet.

The following statement shows the company's condition as of January 1, 1923, after giving effect to the sale of $5,000,000 of general mortgage bonds:

#### Assets.

| | | |
|---|---:|---:|
| Fixed assets: | | |
| Land (as appraised) | $ 2,642,576 00 | |
| Refinery | 10,150,334 35 | |
| Contract for marine equipment | 1,107,778 00 | |
| Oil lands (as appraised) | 2,500,000 00 | |
| Total fixed assets | | $16,400,688 35 |
| Quick assets: | | |
| Cash on hand and in bank | $ 1,708,340 65 | |
| Accounts receivable (Sept. 30) | 1,231,110 86 | |
| Inventory of oil | 1,222,558 09 | |
| Inventory of material & supplies | 208,166 84 | |
| Total quick assets | | 4,370,176 44 |
| Other assets (prepaid items) | | 252,986 36 |
| Total assets | | $21,023,851 15 |

F.D.C
G. G. B. (authorized) by F.D.C.
S.V.

| | | |
|---|---:|---:|
| Capital stock: | | |
| 7% preferred stock | $ 6,000,000 00 | |
| Common stock, no par value, 600,000 shares | 4,522,442 94 | |
| Total capital stock | | $10,522,442 94 |
| Funded indebtedness: | | |
| First mortgage bonds, closed issued | 4,714,000 00 | |
| General mortgage bonds | 5,000,000 00 | |
| Total funded indebtedness | | 9,714,000 00 |
| Quick liabilities: | | |
| Accounts payable (Sept. 30) | 536,838 00 | |
| Accrued salaries and wages (Sept. 30) | 16,522 23 | |
| Accrued insurance, interest, taxes, estimated on Sept. 30th figures | 152,782 73 | |
| Total quick liabilities | | 706,143 17 |
| Reserves: | | |
| For ship repairs (Sept. 30th) | 49,460 32 | |
| For unadjusted credits (Sept. 30th) | 31,804 72 | |
| Total reserves | | 81,265 04 |
| Total liabilities | | $21,023,851 15 |

NOTE: The Company has purchased 7 tankers of the most efficient type, aggregating 84,000 dead-weight tons, assuming purchase money mortgages of $8,122,350, payable over a period of 15 years. The Company charges its operations with 12 cents on each barrel transported, which amount, on account of the efficiency of the vessels and their extremely low cost of operation, represents no more than the Company would have to pay in chartering ships and is at the same time sufficient to liquidate both principal and interest of the mortgage indebtedness. This arrangement, in effect, provides the Company with an efficient fleet at no capital cost, makes the crude oils of the Continent, wherever located, available to the refinery and insures the Company against the possibility of excessive charter rates that might adversely affect its profits.

### Management.

The company is under the executive direction of a highly efficient organization, the principal members of which are substantially interested in the stock of the company.

The board of directors includes: F. Douglas Cochrane, chairman of the board; Llewellyn Howland, vice president; Gaspar G. Bacon, vice president; Allan Forbes and John Wells Farley, respectively president and director of State Street Trust Company; Bradley W. Palmer, director of United Fruit Company; George W. Treat and Richard B. Young, directors of E. H. Rollins & Sons; Donald McKay Frost, of Loring, Coolidge, Noble & Boyd; John C. Cosgrove, of Cosgrove & Co., Johnstown, Pa.; John P. Bowditch, director of New England Fuel Oil Company of Massachusetts; John B. Shearer, R. M. H. Harper, R. L. Agassiz, president Calumet & Hecla Mining Company; Malcolm G. Chace, of M. G. Chace Company, Boston; and Alexander Smith, of Peabody, Houghteling & Co., Chicago.

### Provisions of the Mortgage.

In the mortgage securing these bonds the company agrees that while any of these bonds are outstanding and unpaid, it will not deplete its net working capital below $3,000,000 by investment in plant or by the payment of dividends. The company further agrees that it will not pay any dividends until it has accumulated a net working capital of $5,000,000, nor thereafter deplete this amount by the payment of dividends.

The mortgage further provides that the company's Venezuelan oil lands may be released from the lien of this indenture upon payment of the trustee of the sum of $2,500,000 in cash, which amount shall be added to sinking fund and used in the purchase or redemption of the general mortgage bonds.

The mortgage also provides that as a condition precedent to the issuance of any of the reserved bonds, the company's net earnings available for interest and taxes for the 12 months next preceding the date of their is-

suance must have been at the rate of not less than three times the annual interest requirements for all bonds of this issue outstanding and to be outstanding.

F. D. C.

S. V.

G. G. B.

### Common Stock Warrants.

There have been deposited with the trustee under the mortgage securing these bonds 500,000 shares of the company's stock, and there is attached to each bond a detachable warrant giving the holder the right to purchase 100 shares of this stock for each $1,000 bond and 50 shares for each $500 bond at the price of $10 per share. This right remains good until the bonds are paid or redeemed and the bond itself can be used at par (interest being adjusted in cash) in purchasing the stock.

We recommend these bonds as a sound investment for the following reasons:

1. The margin of security is ample and there is a cash investment of over $10,000,-000 behind the bonds.

2. The operation of the sinking fund will rapidly reduce the indebtedness and increase the margin of security.

3. The margin of earnings for the protection of interest is nearly 7 to 1, and as a result of this financing, the margin should materially increase.

4. Owning its own oil leases and its own fleet of tankers, having a highly efficient refinery, ideally located on tide water and rail in the immediate proximity of the largest fuel oil market in the United States, amply financed, and well managed, with the market for its product well established, the business of the company is fundamentally sound and profitable.

5. The ownership of the property is in strong hands, entirely capable of protecting their investment, and the ability of the management is evidenced not only by the steady increase in sales but by the remarkably small amount of cash tied up in inventories and receivables for a company doing a business of $20,000,000 a year.

6. The interest return on the investment is unusually good, considering the soundness and fundamental character of the security, and the common stock warrants attached to the bonds furnish an opportunity to the investor to participate in the future profits of the company.

Application will be made to list these bonds, as well as the preferred and common stock of the company, on the Boston Stock Exchange.

All legal matters pertaining to this issue of bonds have been approved on behalf of the company by Messrs. Storey, Thorndike, Palmer & Dodge, and on behalf of the bankers by Messrs. Ropes, Gray, Boyden & Perkins. The American Oil Engineering Corporation, under the direction of Messrs. Sanderson and Porter, have reported on the company's plant and business. The Venezuelan oil lands have been reported on by Messrs. Ralph Arnold and Edwin B. Hopkins, well known geologists. The books of the company have been audited by Messrs. Price, Waterhouse & Co.

F. D. C.

S. V.

G. G. B.